VANITY FAIR PAPER MILLS, INC., Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 74, Docket 27562.

United States Court of Appeals Second Circuit.

Argued Oct. 30, 1962.

Decided Nov. 27, 1962.

---

482

John S. Luckstone, New York City (Olwine, Connelly, Chase, O'Donnell & Weyher, John Logan O'Donnell, New York City, of counsel), for petitioner.

E. K. Elkins, Washington, D. C., James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Richard Whittington Whitlock, Atty., for Federal Trade Commission.

Before CLARK, FRIENDLY and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

Vanity Fair Paper Mills, Inc., petitioner here but to which we will hereafter refer as "respondent", the position that it occupied before the Federal Trade Commission, asks us to set aside an order of the Commission finding that it violated § 2(d) of the Robinson-Patman Act, 49 Stat. 1527 (1936), 15 U.S.C. § 13(d), quoted in the margin.[1] We deny the petition and will enforce the order save for a single minor modification.

The evidentiary record, a four-page stipulation of facts with three attached exhibits, tells us the following: Respondent is in the business of manufacturing "household paper products" in New York and selling them in interstate commerce to retail and wholesale grocers and druggists in Texas, Louisiana and other states. In 1958, it used a standard contract, as to which the Commission has not here complained, wherein it agreed to reimburse its customers for displaying and advertising its products at fixed prices per case; the contract stated "This Cooperative Advertising

1. "(d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with processing, handling, sale, or offering for sale of any products or commodities manufactured, sold or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

Agreement is openly offered to any and all customers able to perform the required services."[2]

The complaint here relates to payments outside the framework of the standard contract; Paragraph 6 of the stipulation gives the background:

"6. During 1958, the foregoing standard contract constituted the only offer made by respondent to Weingarten and its competitors to compensate such customers for the furnishing of any services or facilities in connection with their offering for sale or selling respondent's products. During said period, respondent did not solicit or request from its customers the furnishing of any services or facilities in addition to those regularly furnished under the standard contract. Respondent did not have sufficient funds available for extensive advertising in various media and relied on the support of customers' promotions. It was its policy, therefore, to take under consideration any request made by any customer for respondent's participation in one-time special promotions conducted by that customer, such as anniversary sales, wherein respondent's products would be featured along with those of other suppliers. It was respondent's policy to participate in such promotions if payment requested for services rendered therein was in an amount reasonably related to the cost of the services to the customer. If hearings were held in this proceeding, a representative of respondent would testify that all sales representatives of respondent were advised of these policies and were instructed to inform respondent's customers thereof."

Weingarten, mentioned in the paragraph just quoted, was a retail grocery chain, operating in southeastern Texas and southwestern Louisiana, which pur-chased from respondent the same household paper products as did other customers who competed in their resale in the same territory. Weingarten requested respondent and other suppliers to participate in a 57th Anniversary Sale in February, 1958; to that end it submitted a schedule giving the supplier a choice of various possible commitments. These ranged from $56.05, which would provide $\frac{1}{16}$ page of a section in a Lake Charles paper plus the "entire service" by way of "personal enthusiasm and carefully laid plans for presentation of all merchandise to insure success on an overall basis", to $3995.90 for "Full page, including entire service" in a number of different areas. Respondent opted for $215.00, for which it received "the entire promotional service with the display and resale of its product during the Anniversary Sale in all the Weingarten stores located in Texas and Louisiana and with advertising consisting of $\frac{1}{16}$ of a page in newspapers with distribution in Houston, Freeport, Baytown and Texas City." In October, 1958, Weingarten made a similar request for respondent's participation in its 20th Texas and Louisiana Products Sale, and obtained a similar response. Only one other of respondent's customers who competed with Weingarten in southeastern Texas and southwestern Louisiana received a special promotional allowance in 1958; this was Childs Big Chain, which received $152.00. None of the 26 others requested such an allowance. The combination of cooperative advertising payments under the standard contract and special promotional allowances gave Weingarten 3.4% and Childs 2.2% on respondent's gross sales to them; the percentages for the other customers, who received no special allowance, ranged from 1.9% to zero.

After proceedings which it is unnecessary to detail, the Commission found that payment of the special allowance to Wein-

2. The advertising requirement was "at least once during each calendar quarter in all newspapers regularly used by the Advertiser, with a minimum space of one column inch."

garten violated § 2(d) of the Robinson-Patman Act and ordered that respondent

"in or in connection with the sale in commerce as 'commerce' is defined in the Clayton Act, as amended, of paper products, do forthwith cease and desist from:

"Making or contracting to make, to or for the benefit of J. Weingarten, Inc., or any other customer, any payment of anything of value as compensation or in consideration for advertising or other services or facilities furnished by or through such customer, in connection with the handling, offering for resale, or resale of the respondent's products, unless such payment is offered or otherwise affirmatively made available on proportionally equal· terms to all other customers competing in the distribution or resale of such products."

Commissioner Elman, agreeing that the record supported a finding of violation of § 2(d), dissented with respect to the form of the order, which he did not consider to be "the most effective and appropriate remedy for dealing with the violation found." Respondent claims that the Commission was not warranted in issuing any order and, in the alternative, that the order was too broad. We

find no merit in the first claim and but little in the second.

## I.

It is not disputed that Weingarten received from respondent something of value for services or facilities furnished in the sale of respondent's products which was not received by "other customers competing in the distribution of such products or commodities." [3] The issue is whether the Commission was warranted in finding that the "payment or consideration" given to Weingarten was not "available" to all the non-recipients "on proportionally equal terms."

Determination of what a seller must do in order that payments of the sort described in § 2(d) should be "available" to all customers has not been easy. The problem inherent in the vagueness of the term is aggravated by the use of the word "accorded" in the parallel § 2(e), dealing with services and facilities furnished by the seller.. Moreover, the provision that became § 2(d) initially used the word "offered".[4] The dictionary would suggest that "accorded" requires more in the way of affirmative action than "available", as "offered" surely does, thereby giving color to an argument that the standard of "availability" in § 2(d) is not a very high one. As against this the report of the House Judiciary Committee, which inserted "available" into § 2(d), seems to treat the standards of

3. The stipulated fact that "certain of the same household paper products" promoted by Weingarten in return for the special allowances were sold by respondent to customers who competed with Weingarten in the same area during the same period renders inapplicable the considerations that led us to invalidate the Commission's order in Atalanta Trading Corp. v. F. T. C., 258 F.2d 365 (2 Cir. 1958).

4. This was true of the original Robinson bill, S. 3154, 74th Cong., 1st Sess. (June 26, 1935), and the identical Patman bill, H.R. 8442, 74th Cong., 1st Sess. (June 11, 1935). The Robinson bill passed the Senate in this form, but the Patman bill was reported out of the House Judiciary

Committee with the word "available" substituted for "offered." See H.R.Rep. No. 2287, 74th Cong., 2d Sess., 19 (1936). Neither this report nor the Conference Report, H.R.Rep. No. 2951, 74th Cong., 2d Sess., 1–9 (1936), discussed the change.

The term "accorded" in what is now § 2 (e), on the other hand, remained constant throughout the legislative process. It was present where that section originated, in § 6(b) of the Utterback bill, H.R. 10486, 74th Cong., 2d Sess. (Jan. 22, 1936), and remained intact when taken over into the Patman bill by the same House Committee that changed "offered" to "available" in § 2(d). See H.R.Rep. No. 2287, supra.

§ 2(d) and § 2(e) as equivalent,[5] thereby supporting a contrary argument that "available" should be read with the flavor of "accorded".

■ Even against this confused semantic background, a few cases are plain. A promotional allowance is not "available" to all customers if it has been "denied" to some. Corn Products Refining Co. v. F. T. C., 324 U.S. 726, 744, 65 S.Ct. 961, 89 L.Ed. 1320 (1945). Neither is it "available" if steps have been taken to conceal it. On the other hand, the legislative history noted above argues against a construction that would require the seller to make an actual "offer" to all customers, including many who might not be interested. Between these polar positions the Commission has shifted uneasily. For some years it tended toward an ever stronger attitude coming perilously close to requiring an offer, as can be seen by comparing earlier cases where the complaint emphasized secrecy and concealment, e. g., N. Erlanger, Blumgart & Co., 46 F.T.C. 1139, 1142 (1950), with the increasingly severe requirements of affirmative and specific notification set forth in Kay Windsor Frocks, Inc., 51 F.T.C. 89, 95 (1954); Henry Rosenfeld, Inc., 52 F.T.C. 1535, 1548 (1956); and Chestnut Farms Chevy Chase Dairy, 53 F.T.C. 1050, 1060 (1957). Then it made a slight retreat toward a more generalized notification requirement in its 1960 Guides for Advertising Allowances and Other Merchandising Payments and Services, 1 C.C.H. Trade Reg. Rep., pages 6072, 6075, which say:

> "The seller should take some action to inform all his customers competing with any participating customer that the plan is available. He can do this by any means he chooses, including letter, telegram, notice on invoices, salesmen, brokers, etc. However, if a seller wants to be able to show later that he did make an offer to a certain customer, he is in a better position to do so if he made it in writing."

See Rowe, Price Discrimination under the Robinson-Patman Act, 411–414 (1962). Unsatisfactory as the 1960 formulation may be, perhaps it is as much as can be expected when Congress has spoken in such Delphic terms.

■ A showing here not only that respondent's sales representatives had been "advised" of its policies with respect to special promotional allowances and "instructed to inform respondent's customers thereof", but also that they had carried out such instructions, would have met the Commission's definition of the statutory standard. See J. H. Filbert, Inc., 54 F.T.C. 359, 362–363 (1957). However, the stipulation was altogether silent on the latter score. The Commission was entitled to deem the silence significant and to conclude, as it did, that the information had not been generally passed on. An inference may be drawn not merely from what a stipulation says but from what it fails to say. The statement in Evans' Notes to Pothier II quoted in 2 Wigmore, Evidence (3 ed. 1940), page 164, is fairly applicable here:

> "When weaker and less satisfactory testimony is tendered in support of a fact the nature of which will admit of elucidation from proofs of a more direct and explicit character, the same caution which rejects evidence of an inferior degree when higher evidence might be produced will awaken suspicion; and it will reasonably be supposed that a more perfect exposition of the subject would have laid open deficiencies and objections which a more obscure

5. See note 4, supra. Thus, the Committee stated, H.R.Rep. No. 2287, 74th Cong., 2d Sess. 16 (1936), that
 "Sections (c) and (d) of the bill address this evil by prohibiting the granting of such allowances, either in the form of services or facilities themselves furnished by the seller to the buyer, or in the form of payment for such services or facilities when undertaken by the buyer except when accorded or made available to all competing customers on proportionally equal terms."

and uncertain representation was intended to conceal."

It is true that the inference from the non-production of evidence cannot be availed of by a party having the burden of persuasion "until the burden of producing evidence has shifted". 2 Wigmore, Evidence (3 ed. 1940), p. 179. But proof that the special allowance was paid to Weingarten and one other chain, and that it was not paid to other customers, sufficed to shift the burden of producing evidence of "availability" to respondent and thus to permit the Commission to draw an inference from the weakness of the evidence offered to sustain it. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 225–226, 59 S.Ct. 467, 83 L.Ed. 610 (1939).

Respondent argues that it would be more reasonable to infer that the salesmen had in fact passed on the information to all customers, since it was in their interest to do so. But that would depend on just what the salesmen were told and how they were told it—more specifically, on whether respondent welcomed one-time special promotions by its customers or regarded them as something of a nuisance, a view which the paucity of requests and the selection of one of the least expensive promotions offered by Weingarten might suggest. The contrast between respondent's word of mouth policy as to special promotions and its written "openly offered" Cooperative Advertising Agreement could also be deemed significant. In any event the choice between competing reasonable inferences is the Commission's, not ours. Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 50, 74 S.Ct. 323, 98 L.Ed. 455 (1954). Here the Commission's conclusion that the test of availability was not satisfied is far from unreasonable.

We also sustain the Commission's alternative position that even if respondent's special promotional allowances were "available" to all customers, they were not available "on proportionally equal terms." Interpretation of this "provocatively vague" phrase, Rowe, supra, at 370, has also occasioned difficulty. Although the test of proportional equality can be met by a plan conforming to any one of the three basic types described in the Report of the Attorney General's Committee on the Antitrust Laws, 189 (1955),[6] or, we should suppose, by a combination of them, still other methods may comply. See F. T. C. v. Simplicity Pattern Co., 360 U.S. 55, 61 fn. 4, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959); Liggett & Myers, CCH Trade Reg. Rep. 28,256 (1959–60); F. T. C. Guides, supra, 1 CCH Trade Reg. Rep. at 6075. Little as the stipulation here tells us of respondent's "policy", it tells enough to show that the requirement of proportional equality was not satisfied. Even as to identically situated customers, the policy left respondent free to discriminate both in the quantum of promotional services it would support and in the degree to which it would support them. Altogether consistently with its policy, respondent could have paid Weingarten as much as $3995.90 and an identically situated competitor, offering it the same choices as Weingarten, as little as $56.05. It is true that since Weingarten would have had to furnish more newspaper advertising than its competitor, respondent would have derived greater benefit from the larger payment, although perhaps not proportionally greater, since both customers would have been furnishing the same displays and "personnel enthusiasm." But Weingarten would have received an enormously greater benefit from respond-

6. These are:
 "(1) payment of a dollar allowance per unit of promotional service rendered by each buyer, up to a uniform maximum percentage of his dollar volume; (2) a simplified plan, granting each buyer a set dollar allowance per unit of merchandise bought, on condition that he perform a specified minimum quantum of promotional services; (3) the *seller's* direct furnishing of promotional services to the buyer, worth a uniform percentage of each buyer's volume."

ent than the equally entitled competitor. Also, even if respondent chose to support the same advertising space for identical customers, the policy did not require it to pay a uniform proportion of the cost but only "an amount reasonably related" thereto; if the stipulation meant "equal to" or "the same percentage of" the cost, it did not say so. Neither did the policy make any attempt to relate the amount of support accorded different customers to their respective volumes of purchases. To be sure, it was not established that respondent in fact applied its policy in a discriminatory fashion. But a seller who has paid a special promotional allowance to some customers and not to others does not avoid the proscription of § 2(d) merely because payment *might have been* "available on proportionally equal terms to all other customers competing in the distribution of such products or commodities"; he avoids it only if such payment "is" available. Whatever the statute does or does not require with respect to proportionality, it is not satisfied by a policy as loose as respondent's. See Rowe, supra, 372–373. This affords the very opportunity for disparate treatment which the Robinson-Patman Act aimed to end.

## II.

Respondent objects to the scope of the order on three different grounds:

 (1) Respondent objects to the description of the area of commerce as "paper products", insisting this should be "household paper products", the term used in the stipulation. The Commission justified the broader definition "in view of the difficulties which might develop in the future in attempting to determine the type of product" indicated by the narrower one. This appears reasonable, apart from other justifications that might be urged, see Niresk Industries, Inc. v. F. T. C., 278 F.2d 337, 343 (7 Cir.), cert. denied, 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104 (1960), on which we do not find it necessary to pass.

 (2) Respondent says that the prohibition with respect to payments for

"advertising or other services or facilities" should be limited to in-store displays and newspaper advertising, the specific services furnished by Weingarten, or in any event to "advertising or promotional display services or facilities", citing for the latter the final decrees entered in Swanee Paper Corp. v. F. T. C., 291 F.2d 833 (2 Cir. 1961), cert. denied, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962), and Grand Union Co. v. F. T. C., 300 F.2d 92 (2 Cir. 1962). Respondent's first proposal would leave it free to repeat the very practice here found to violate § 2(d) if only it substituted radio or television for newspaper advertising; the Commission's power to prevent future violations is not so circumscribed. Cf. F. T. C. v. Mandel Bros., Inc., 359 U.S. 385, 392–393, 79 S.Ct. 54, 3 L.Ed.2d 55 (1959). Neither can we accept respondent's more modest proposal precisely as advanced; the suggested language would have to be supplemented by a reference to "like or related practices." See F. T. C. v. Mandel Bros., Inc., supra; F. T. C. v. Henry Broch & Co., 368 U.S. 360, 362–364, 82 S.Ct. 431, 7 L.Ed.2d 353 (1962). But a description of the forbidden conduct in terms of "advertising or promotional display services or facilities and like or related practices" would, we think, be somewhat better related to respondent's offending while still sufficiently prohibiting "variations on the basic theme." Consumer Sales Corp. v. F. T. C., 198 F.2d 404, 408 (2 Cir. 1952), cert. denied, 344 U.S. 912, 73 S.Ct. 335, 97 L.Ed. 703 (1953). We will modify the order to this minor extent.

 (3) Respondent's final point has two aspects. It complains that the order parrots the statute, yet that it does not do this precisely. For the first aspect it relies on the thoughtful dissent of Commissioner Elman, which urged that the Commission "should avoid the easy 'solution' of simply incorporating *haec verba* general statutory prohibitions couched by Congress, and justifiably so, in broad, indefinite, and ambiguous terms." Specifically he suggested that the order here be drafted in terms of

forbidding any promotional allowances unless respondent were "affirmatively to establish and maintain prescribed procedures whereby all customers of its products are informed of the terms of any promotional payment made to one or some of them, and all are given an opportunity to receive the same benefits, or a fair equivalent, on the same terms." Although experimentation by the Commission in drafting orders along such lines would indeed seem useful, for reasons eloquently stated a decade ago by Mr. Justice Jackson in F. T. C. v. Ruberoid Co., 343 U.S. 470, 480–494, 72 S.Ct. 800, 96 L.Ed. 1081 (1952), we cannot say, nor did Commissioner Elman, that such a course is required; the fact that Mr. Justice Jackson's opinion was a dissent sufficiently proves this. The second aspect of the objection, in some degree inconsistent with the first, is that here the Commission did make the prohibition in the order somewhat more specific than the language of the Act by substituting for the statutory "is available" the words "is offered or otherwise affirmatively made available." If these words are a permissible construction of the statute, as we have intimated, their use in the order is surely unobjectionable; but even if they are not, an order may permissibly require one who has violated the law to conform to a somewhat higher standard of future conduct than one who has stayed within it. F. T. C. v. National Lead Co., 352 U.S. 419, 429–431, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957). The difficulties respondent foresees in determining whether it is complying with the order seem factitious. The order contains the usual provision for the filing of a report of compliance, 16 C.F.R. § 3.26, and it is scarcely likely that if respondent proposes a method of compliance which the Commission accepts, and thereafter follows it, the Commission will subsequently and without notice claim a violation entailing the civil penalties of 15 U.S.C. § 21(*l*). If at some future time respondent should desire to change to a procedure different from what it orginally proposed, it need not proceed at its peril. The Commission's offices will still be open for discussion, compare F. T. C. v. National Lead Co., supra, at 431, 77 S.Ct. at 510, whether or not, as Commission counsel suggested at the argument, the further remedy of the declaratory order procedure of § 5(d) of the Administrative Procedure Act, 5 U.S.C. § 1004(d), will also be available. See 1 Davis, Administrative Law Treatise, 272–278 (1958) and 1960 supplement, 13–14

The order will be enforced as modified. The Commission may submit a decree.