**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**ST. REGIS PAPER COMPANY,**
**Defendant-Appellant.**

**No. 62, Docket 29746.**

United States Court of Appeals
Second Circuit.

Argued Sept. 20, 1965.

Decided Jan. 19, 1966.

Horace R. Lamb, New York City (Le-Boeuf, Lamb & Leiby, H. Richard Wachtel, James H. Durand, New York City, on the brief), for defendant-appellant.

James F. Buckley, Atty., U. S. Dept. of Justice (Donald F. Turner, Asst. U. S. Atty. Gen., Lionel Kestenbaum, Atty., U. S. Dept. of Justice, Robert L. Wright, Acting Asst. Atty. Gen., Robert B. Hummel, Atty., Dept. of Justice, Washington, D. C., on the brief), for plaintiff-appellee.

Dunnington, Bartholow & Miller, New York City, Briggs & Morgan, St. Paul, Minn., on the brief of Bemis Bros. Bag Co. as amicus curiae, in support of defendant-appellant.

Before MOORE, SMITH and ANDERSON, Circuit Judges.

MOORE Circuit Judge.

In 1959 the Federal Trade Commission (FTC) issued a consent cease and desist order prohibiting appellant, St. Regis Paper Co. and 16 other manufacturers of multiwall paper shipping sacks, from engaging in certain concerted pricing practices. During the years 1962, 1963 and 1964, the Antitrust Division of the United States Justice Department convened two grand juries in the United States District Court for the Eastern District of Missouri to investigate possible violations of the Sherman Act, 15 U.S.C. §§ 1, 2, by appellant and others, arising out of their pricing practices. No indictment, however, was returned against any party. Thereafter, the Attorney General, at the request of the FTC[1] and in reliance on information

1. During October 1962 the Antitrust Division of the United States Justice Department,' pursuant to regular liaison procedure, notified the FTC of the pending grand jury investigation. On July 30, 1963 the Chairman of the Commission at its request sent a copy of the 1959 order to the Attorney General and requested him to "initiate appropriate proceedings under Section 16 of the Federal Trade Commission Act * * * looking to the recovery of civil penalties should your examination of the results of the * * * investigation indicate a violation of the Commission's order."

obtained during the three-year grand jury investigation commenced the present suit in the United States District Court for the Southern District of New York to recover civil penalties under Section 5(*l*) of the Federal Trade Commission Act (FTCA), 15 U.S.C. 45(*l*),[2] in the amount of $230,000 for the alleged violation by appellant of the 1959 FTC consent cease and desist order.

Subsequently, appellant moved to dismiss the complaint asserting that the district court lacked subject matter jurisdiction since the FTC had not, in accordance with its usual practice, certified the case to the Attorney General pursuant to Section 16 of the FTCA, 15 U.S.C. § 56.[3] Appellant contended that the requirements of Section 16 were jurisdictional and that the Attorney General had no power to proceed under Section 5(*l*) absent an FTC certification. The district court denied the motion, finding that the Section 16 certification procedure was not "so essential a part of the statutory scheme" that congressional intent would be frustrated if the Attorney General proceeded under Section 5(*l*) without it. The court concluded that Section 16 merely defines an administrative function of the FTC, "a method to be used by * * * [it] in the normal course of discharging its duty," which does not affect the power of the Attorney General to institute civil penalty suits

under Section 5(*l*). United States v. St. Regis Paper Co., 240 F.Supp. 36, 38 (S.D.N.Y.1965).

Upon appellant's motion, the district court amended its decision to conform to the requirements of the Interlocutory Appeals Act, 28 U.S.C. § 1292(b). Thereupon, appellant applied to this court for leave to appeal and the application was granted April 7, 1965.

This appeal very possibly raises for the first time the question of whether Section 16 of the FTCA, which provides that whenever the FTC has reason to believe that anyone subject to a Commission cease and desist order is liable to a penalty under Section 5(*l*) of the FTCA, "it shall certify the facts to the Attorney General, whose duty it shall be to cause appropriate proceedings to be brought" to enforce Section 5(*l*), constitutes an absolute limitation on the Attorney General's power to commence suits for civil penalties under Section 5(*l*). Appellant contends that Section 16 and Section 5(*l*) of the FTCA must be read and applied together,[4] and points out that this is the first civil penalty suit in which the Attorney General has proceeded under Section 5(*l*) on his own motion. The Government, while conceding that civil penalty suits are customarily initiated by FTC certification, regards that procedure as merely a convenient means

---

2. § 5(*l*) of the Act, 15 U.S.C. § 45(*l*) provides in pertinent part that:

> Any person, partnership, or corporation who violates an order of the Commission to cease and desist after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States.

Eight other civil penalty suits were simultaneously commenced in the United States District Court for the Southern District of New York against other manufacturers of multiwall paper shipping sacks that had consented to the 1959 cease and desist order. The aggregate amount of penalties claimed in all the actions, including this one, is $865,000.

3. § 16 of the Act, 15 U.S.C. § 56 provides that:

> Whenever the Federal Trade Commission has reason to believe that any person, partnership or corporation is liable to a penalty under section 54 of this title or under subsection (*l*) of section 45 of this title, it shall certify the facts to the Attorney General, whose duty it shall be to cause appropriate proceedings to be brought for the enforcement of the provisions of such section or subsection.

4. Appellant does not claim, however, that the Attorney General is a mere "rubber stamp" for the Commission but, rather, that subsequent to FTC certification, he may exercise his discretion and decline to bring suit. See Anderson, Settlement and Compliance Procedures, 14 ABA Antitrust Section Rep. 60, 65 (1959).

for informing the Attorney General of possible violations of the Commission's orders. It contends that Section 5($l$) fully empowers the Attorney General to initiate civil penalty suits on the basis of independently obtained information, regardless of the Commission's view concerning the alleged violation of its order, and asserts that the courts have implicitly recognized the jurisdictional completeness of Section 5($l$). The question of the interrelationship between Section 5($l$) and Section 16, however, was not raised in any case cited by the Government, see United States v. American Greetings Corp., 168 F.Supp. 45 (N.D. Ohio), aff'd 272 F.2d 945 (6th Cir. 1958); United States v. Piuma, 40 F. Supp. 119 (S.D.Cal.), aff'd 126 F.2d 601 (9th Cir. 1941); United States v. Hindman, 179 F.Supp. 926 (D.N.J.1960), nor has it been raised in any case litigated to date under the FTCA.

It is generally recognized that whether procedural requirements such as those set forth in Section 16 of the FTCA are mandatory cannot be determined by merely examining the form of the statute involved, i. e., by a mere literal reading of the law, but "can only be determined by ascertaining the legislative intent. If a requirement is so essential a part of the plan that the legislative intent would be frustrated by a noncompliance, then it is mandatory." Vaughn v. John C. Winston Co., 83 F.2d

370, 372 (10th Cir. 1936); Van Keppel v. United States, 206 F.Supp. 42 (D.Kan. 1962). See generally 3 Sutherland, Statutory Construction §§ 5801–5826 (3d ed. 1943). Unfortunately, the legislative history of Sections 16 and 5($l$) is sparse and unilluminating and, thus, sheds little light on their intended relationship. Both provisions were enacted as part of the 1938 Wheeler-Lea Amendment to the FTCA which was aimed primarily at broadening the FTC's jurisdiction by granting it power to regulate "unfair or deceptive acts or practices in commerce" in addition to "unfair methods of competition in commerce," and at eliminating the cumbersome procedures for the enforcement of FTC cease and desist orders by providing that they would become final unless an appeal were taken within the statutory time period provided. 15 U.S.C. §§ 45(a), (g). Both Section 5($l$) and Section 16 were introduced into Congress and included in the 1938 amendment with little explanation or elaboration in hearings or debates.[5] See Austern, Five Thousand Dollars a Day, ABA Section of the Antitrust Law 285, 289 (1962). The Government urges, however, that a remark made by Congressman Lea while discussing the relation between Section 16 and Section 14 of the FTCA, 15 U.S.C. § 54, which provides for fines and imprisonment for false advertising in violation of 15 U.S.C. § 52(a),[6] to the effect that the Attorney

5. Moreover, while § 5($l$) was briefly mentioned in the report of the House committee which added § 16 to the FTCA and in the report of the conference committee on the amendment as finally passed, neither report mentioned § 16. See H.R.Rep. No. 1613, 75 Cong., 1st Sess. 4 (1937); H.R.Rep. No. 1774, 75th Cong., 3d Sess. 9–11 (1938). Also, the records of the FTC, which strongly supported the amendment, are silent with respect to the intended relationship between § 5($l$) and § 16. Finally, the legislative history of the finality and civil penalty provisions added to the Clayton Act in 1959, 15 U.S.C. § 21(g), (1), which were patterned after the FTCA, contains little discussion of the civil penalty method of enforcing Commission orders and contains no explanation of the failure to

include in the Clayton Act a certification provision similar to § 16 of the FTCA. See H.R.Rep. No. 580, 86th Cong., 1st Sess. (1959); 2 U.S.Code Cong. & Admin. News, 86th Cong., 1st Sess. pp. 1808–1816 (1959). It was assumed by some, however, that a certification procedure would normally be used. Hearings on H.R. No. 432 Before the House Committee on the Judiciary, 86th Cong., 1st Sess. 1, 17 (1959).

6. 15 U.S.C. § 54(a) provides in relevant part that:
 Any person, partnership, or corporation who violates any provision of section 52(a) of this title [dissemination of false advertisements] * * * shall, if the use of the commodity advertised may be injurious to health because of results from such use under the condi-

General could prosecute violations of that section on his own motion, without awaiting FTC certification,[7] demonstrates that certification is equally dispensable with respect to Section 5(*l*) civil penalty suits. We do not feel that this expression of opinion has any significance for the problem presented here. The Government's position fails to recognize the fundamental difference in kind between the rule of conduct enforced under Section 5(*l*)—a cease and desist order issued by the FTC in an adjudicatory proceeding or with the consent of the party proceeded against, and the rule of conduct enforced under Section 14(a) a federal criminal statute. While it is reasonable to presume that when Congress enacts a criminal statute it intends to authorize the Attorney General to enforce the statute on his own motion, i. e., public policy favors the unencumbered enforcement of criminal laws, no such presumption of public policy operates here where the authority of the Attorney General to punish violations of FTC cease and desist orders is at issue.

■ Since there is no direct evidence of congressional intent with respect to the relation between Section 5(*l*) and 16, it must be ascertained by examining the purposes and objectives of the FTCA as a whole in terms of objective criteria, i. e., the relevant inquiry is "how, one supposes, it [the legislative scheme] * * * would appear to a 'reasonable' interpreter." Bishin, The Law Finders: an Essay in Statutory Interpretation, 38 So.Cal.L.Rev. 1, 3 (1965). We regard the view that Section 5(*l*) fully empowers the Attorney General to initi-

ate civil penalty suits as inconsistent with the grant of far-reaching and exclusive regulatory power to the FTC in Section 5 of the FTCA, 15 U.S.C. § 45(*l*). It is highly unlikely that Congress intended to grant the Attorney General plenary power to punish violations of Commission orders in view of the fact that when it enacted Sections 5(a) and (b) of the FTCA, 15 U.S.C. § 45(a), (b), it granted the FTC exclusive authority to enforce the proscription against unfair methods of competition and deceptive acts or practices in commerce and, also, granted the FTC exclusive authority to issue orders to cease and desist from such practices.[8] The duty and responsibility for determining what business practices fall within the purview of Section 5 and for determining whether cease and desist orders issued to eliminate the anti-competitive effects of those practices have been complied with or violated was delegated solely to the FTC. While one objective of the 1938 Wheeler-Lea amendment, including Section 5(*l*), was to "streamline" the procedure for enforcing the Commission's cease and desist orders, it is nowhere indicated that Congress by providing a civil penalty enforcement procedure intended to transfer the responsibility for interpreting and investigating violations of such orders to the Attorney General.

■■ It must be kept in mind that the "Federal Trade Commission Act is not a revenue-raising or penal measure," Quaker Oats Co. Trade Reg. Rep. (FTC Complaints, Orders, Stipulations, 1961–1963) ¶15858 at 20651 (April 25, 1962) (Elman, Comm., dissenting), but is one

---

tions prescribed in the advertisement thereof, or under such conditions as are customary or usual, or if such violation is with intent to defraud or mislead, be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not more than $5,000 or by imprisonment for not more than six months, or by both such fine and imprisonment * *.

7. Congressman Lea stated that:
As to the man who advertises an article injurious to health or advertises with intent to defraud or mislead, the provi-

sions of the bill * * * authorize an immediate prosecution of such a man regardless of what the Federal Trade Commission does. He can be arrested and prosecuted immediately. 83 Cong. Rec. 406 (1938).

8. The Commission is also authorized to modify or set aside its orders whenever in its opinion "conditions of fact or of law have so changed as to require such action or if the public interest shall so require. * * * *" 15 U.S.C. § 45(b).

"in which Congress, to make its policy [to preserve and promote competition] effective, has relied upon the initiative of administrative officials and the flexibility of the administrative process." United States v. Morton Salt Co., 338 U.S. 632, 640, 70 S.Ct. 357, 363, 94 L.Ed. 401 (1950). The fact that the FTC has the exclusive power and expertise to formulate policy in its efforts to maintain competition and regulate unfair business practices commands the conclusion that Congress intended it to have the exclusive power to implement that policy by initiating civil penalty suits under Section 5($l$). It is sufficient that the Attorney General has a kind of veto power in that he can refuse to prosecute cases certified to him when, in reliance on his own legal expertise, he considers the evidence insufficient to warrant prosecution.

In support of its contention that Section 16 does not affect the power of the Attorney General to commence suits for civil penalties under Section 5($l$) the Government relies heavily on decisions which have construed allegedly analogous statutory requirements as nonjurisdictional. In United States v. Morgan, 222 U.S. 274, 32 S.Ct. 81, 56 L.Ed. 198 (1911), the United States sought to prosecute a drug dealer for violation of Section 44 of the Pure Food & Drug Act of June 30, 1906, 34 Stat. 768 (repealed —its modern counterpart is the Federal Food, Drug & Cosmetic Act, 21 U.S.C. §§ 301–392) which provided that any dealer who shipped adulterated or misbranded goods in interstate commerce was guilty of a misdemeanor. It was contended that the suit was improper since a provision in the act requiring the Department of Agriculture to provide potential defendants with a hearing prior to certifying facts to the Attorney General for prosecution of alleged violations of the Act had not been complied with. Since another section of the Act expressly empowered the Attorney General to prosecute violations of the Act upon the complaint of a state health officer, the

Court concluded that Congress did not intend the hearing procedure to be mandatory. See also United States v. Dotterweich, 320 U.S. 277, 278–279, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (relied on Morgan for similar construction of Section 305 of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 335). In United States v. Gris, 247 F.2d 860 (2d Cir. 1957), this court held that the Congressional authorization of the Federal Communications Commission to request the Attorney General to prosecute violations of the Federal Communications Act, 47 U.S.C. §§ 501, 605, did not affect his power to prosecute violations on his own motion. In both *Morgan* and *Gris,* the court refused to impose limitations on the general power of the Attorney General to enforce federal criminal statutes in the absence of a more explicit direction from Congress. These cases clearly cannot be relied on to guide our construction of Section 16 of the FTCA, for we are not concerned either with the scope of the Attorney General's authority to enforce federal criminal statutes or with the effect of a statutory provision authorizing an administrative agency to initiate prosecutions of such statutes on his power to prosecute. (Admittedly, the Attorney General has the primary responsibility for enforcing federal criminal laws.) Rather, we are concerned with the extent of his authority to prosecute violations of FTC cease and desist orders which the Commission has the primary responsibility for issuing and interpreting. Moreover, in contrast to the legislative scheme set forth in the Pure Food & Drug Act of June 30, 1906, dealt with by the Court in United States v. Morgan, supra, Section 16 of the FTCA constitutes the exclusive penalty enforcement provision provided by Congress for Section 5($l$). In Section 16, which specifically refers to Section 5($l$), Congress prescribed the circumstances under which civil penalty actions for violations of Commission orders shall be commenced and the officer of the United States who shall prosecute them and in Section 5($l$) it prescribed the amount of

the penalty and the appropriate manner for filing a suit.

 Our conclusion that Sections 16 and 5(*l*) were intended to be mutually inter-dependent disposes of the Government's attempt to invoke the plenary authority of the Attorney General to prosecute all civil actions in which the United States is interested, 28 U.S.C. § 507(a)(2), (b) as a basis for permitting him to initiate suits under Section 5(*l*). The general duty of United States Attorneys to conduct litigation on behalf of the United States can be invoked only in the absence of statutory directions delineating the circumstances under which civil actions can be instituted, i. e., " 'except as otherwise provided by law'," 28 U.S.C. § 507(a), such as those set forth in Section 16 of the FTCA. E. g., United States v. State of California, 332 U.S. 19, 27–29, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); see United States v. Zucca, 351 U.S. 91, 76 S.Ct. 671, 100 L.Ed. 964 (1956).[9]

 In determining the effect—mandatory or directory—to be given Section 16, it is not only appropriate for this court to examine the nature and objectives of the FTCA as a whole but "a significant consideration * * * is a comparison between the results to which each such construction would lead." Holbrook v. United States, 284 F.2d 747, 752 (9th Cir. 1960); 3 Sutherland, supra, ¶ 5806. Concurrent surveillance and enforcement of FTC cease and desist orders by the Commission and the Attorney General would necessarily involve the possibility of conflicting interpretations of such orders. Thus, such a system could result in stultifying the Commission's implementation of its policies, for the Attorney General in proceeding under Section 5(*l*) might well pass adversely on practices considered perfectly proper by the Commission and which, as a result of the FTC's compliance procedures, may have been undertaken with the Commission's consent. Moreover, the situation might arise where a penalty suit threatens injury to competition, i. e., a small company or a new entrant into a highly competitive or highly concentrated market might be prevented from effectively competing in that market by the payment of a large penalty and litigation expenses. If the Commission were not able to exercise control over the situation and effect compliance with its order through some means other than a civil penalty suit, it could not effectively perform its regulatory function. In addition, to require the Commission to relinquish control over a carefully formulated order at the instant it is issued would defeat the purpose of granting it wide discretion in determining the type of order best suited to combat the competitive ills it uncovers, FTC v. National Lead Co., 352 U.S. 419, 428, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); cf. FTC v. Mandel Bros., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); see generally Comment, 29 U.Chi.Law Rev. 706 (1962), to wit, "to exercise a special competence in formulating remedies to deal with problems in the general sphere of competitive practices," FTC v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952). It is readily apparent that broad discretion and exclusive authority to select the means for enforcing the Commission's orders is a necessary corollary of its wide discretion and exclusive power to formulate the order being enforced.[10] Thus, appellant's position,

---

9. In United States v. Zucca, 351 U.S. 91, 76 S.Ct. 671, 100 L.Ed. 964 (1956), the Court held that the filing of "an affidavit of good cause" furnished by a private citizen was a jurisdictional prerequisite to the filing of a denaturalization suit under § 340(a) of the Immigration & Nationality Act of 1957, 8 U.S.C. § 1451(a). It rejected the contention that the general duty imposed on United States attorneys to prosecute all civil actions in which the United States is concerned was enough to support the action of the United States without the affidavit and stated "[w]e think that the public interest is not served by taking such liberties with a specific statutory requirement designed for the protection of naturalized citizens." Id. at 98, 76 S.Ct. at 676.

10. "It cannot be emphasized too often that the function of a cease and desist order is

namely, that the certification procedure provided for in Section 16 should be considered the exclusive means for initiating civil penalty suits authorized in section 5(*l*) is entirely consistent with the responsibilities of the Commission and the regulatory function it is expected to perform.

To relinquish jurisdiction to the Attorney General after the issuance of a cease and desist order would be most unrealistic, for the Commission alone knows the scope of its orders and has been "provided with staffs to institute proceedings and to follow up decrees and police their obedience * * * [which] are expected to * * * take the lead in following through to effective results." United States v. Morton Salt Co., 338 U.S. 632, 640, 70 S.Ct. 357, 363, 94 L.Ed. 401 (1950). In recognition of the fact that "the public interest expressed in the Act is not secured simply by collecting fines and penalties," Quaker Oats Co. Trade Reg. Rep. (FTC Complaints, Orders, Stipulations 1961–1963) ¶ 15858 at 20651 (Elman, Comm., dissenting), and to implement "the basic objective of the Commission, not to exact penalties, but to secure compliance," Austern, supra 323, the Commission has developed practices and procedural rules designed to effect voluntary compliance with its orders. Mr. Morehouse, FTC Assistant General Counsel in charge of compliance, described the practice of the Commission prior to certifying a case to the Attorney General in the following manner:

> We never yet have requested a certification without notifying the respondent that he is considered to be in violation and affording him an opportunity, if he wishes, to come in and discuss the matter in the Compliance Division * * * In other words, we don't immediately jump down his throat. We * * *

see if we can get together and get him to amend his practices so that he can conform to what we think is the requirement of the order * * * [Moreover,] respondent is afforded an opportunity to submit, along with what I send up to the Commission for Certification, a full statement * * * of his position to the Commission.

Hearing on H.R. 432 Before the Antitrust Subcommittee of the House Committee on the Judiciary, 86th Cong., 1st Sess. 20–23 (1959). See also FTC Annual Report 1961 55–58.

The Commission's compliance report procedure supplements this practice by providing those subject to the Commission's orders guidance with respect to future conduct, i. e., advance approval or disapproval of particular business practices, and constitutes "a dedicated effort to help businessmen, both large and small, to bring their practices into compliance with the law, without resort to litigation." Remarks of FTC Chairman Paul Rand Dixon before the Senate Appropriations Committee, reported in 5 Trade Reg. Rep. ¶ 50119 at 55125 (1965). Each respondent named in an order is required to file with the FTC within sixty days after its service a written report setting forth the manner in which compliance will be effected. The FTC reviews the reports and advises "each respondent whether the actions set forth therein constitute compliance with the Commission's order." FTC Rules of Procedure § 3.26(a), 16 C.F.R. § 3.26(a) (Supp. 1965). In addition, those subject to FTC orders can request advice from the Commission as to whether certain conduct will conform to the terms of an order and the Commission "[o]n the basis of facts submitted, as well as other information available to [it] * * * will inform the respondent whether or not the

---

not to punish but to prevent violations of the law," Quaker Oats Co. Trade Reg. Rep. (FTC Complaints, Orders and Stipulations 1961–1963) ¶15858 at 20651 (April 25, 1962) (Elman, Comm., dissenting) and to provide vital guidance to busi-

nessmen. Note, 38 Ind.L.J. 377, 379 (1963). Exclusive FTC control of the machinery for enforcing its orders is required to guarantee the proper performance of their "compliance" function.

proposed course of action, if pursued, would constitute compliance with its order." FTC Rules of Procedure § 3.26(b), 16 C.F.R. § 3.26(b) (Supp.1965).

On the other hand, the Attorney General has no staff of experts continually checking on compliance with FTC orders. Since he has no authority to enforce the FTCA and has no influence or role to play in the formulation of cease and desist orders issued thereunder, his office is simply not equipped or designed to intelligently police the Commission's orders [11] or to develop and maintain a broad, consistent policy in this area. As the Supreme Court has noted "the Commission alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress * * *." Moog Indus., Inc. v. FTC, 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958). Were the Attorney General permitted to concurrently review with the FTC the validity of the business practices of those subject to the Commission's orders, the value of the Commission's practices and rules designed to promote voluntary compliance and avoid the rigors of litigation would be greatly impaired. No respondent could ever reach an understanding with the Commission without also seeking the approval of the Attorney General. In addition, a system of dual surveillance and enforcement would unjustly hamper those subject to orders by creating uncertainty and doubt as to what course of action to follow. Congress could not have intended such a result because reason and experience dictate that businessmen operating under the terms of a Commission order "should be relieved insofar as possible of uncertainties with regard 'to their enterprises and investments and a clear path indicated which they can travel without anxiety.'" Note, 38 Ind.L.J. 377, 379 (1963). Under present practice, once the Commission accepts a proposed method of compliance, it is highly unlikely that it will, without notice or opportunity to discontinue the previously approved conduct, initiate a civil penalty suit for violation of the order. See FTC Rules of Practice § 3.26(c), 16 C.F.R. § 3.26(c) (Supp. 1965); [12] cf. Vanity Fair Paper Mills, Inc. v. FTC, 311 F.2d 480, 488 (2d Cir. 1962). Adoption of the Government's position would deal a serious blow to the reasonable expectations of those who consented to cease and desist orders with the FTC upon the understanding that the compliance procedures and certification practice followed by the FTC would remain in effect for the duration of the order. Thus, it is reasonable to conclude, along with appellant, that Section 16 was designed to protect persons and businesses subject to the Commission's orders from unwarranted penalty suits and to provide them, in conjunction with the judiciary, with the specialized experi-

11. United States v. Union Bag-Camp Paper Co., 5 Trade Reg. Rep. ¶71378 (S.D. N.Y.1965) affords a prime example of the dangers inherent in permitting the Attorney General to independently commence civil penalty suits and the inability of his office to properly interpret FTC orders. There, the district court dismissed two counts of a complaint in § 5(l) civil penalty suit for failure to allege facts constituting a violation of the terms of the 1959 consent cease and desist order involved here.

12. 16 C.F.R. § 3.26(c) (Supp.1965) provides that:

The Commission may at any time reconsider its approval of any report of compliance or any advice given under this section and, where the public interest requires, rescind or revoke its prior approval or advice. In such event the respondent will be given notice of the Commission's intent to revoke or rescind and will be given an opportunity to submit its views to the Commission. The Commission will not proceed against a respondent for violation of an order with respect to any action which was taken in good faith reliance upon the Commission's approval or advice under this section, where all relevant facts were fully, completely and accurately presented to the Commission and where such action was promptly discontinued upon notification of rescission or revocation of the Commission's approval.

enced guidance of the Commission. The fact that a respondent can adequately defend against ill-founded civil penalty actions by the timely utilization of the Federal Rules of Civil Procedure does not justify the Attorney General's invocation of the judicial process in the first instance. Certainly pre-certification screening by the FTC, required by Section 16, eliminates to a large extent the possibility that unnecessary time and money will be expended in litigation by those subject to Commission's orders and the public.

Additionally, a system of dual surveillance and enforcement of FTC orders would in all probability jeopardize the Commission's vitally important consent order procedure,[13] FTC Rules of Practice § 2.1–2.4, 16 C.F.R. § 2.1–2.4 (Supp. 1965), since under such a system cease and desist orders would not provide reliable guidance. Businessmen could hardly be expected to consent to orders to cease and desist knowing that the Attorney General could disregard the Commission's interpretation of the negotiated order and invoke Section 5(l) on his own motion.

Thus, it is apparent that the circumstances here are in no way similar to those which confronted the court in United States v. Hinman Farms Prods. Inc., 156 F.Supp. 607 (N.D.N.Y.1957) relied on by the Government. There, a suit to collect moneys allegedly owing to the Market Administrator for failure to make payments required by a regulation issued by the United States Department of Agriculture was opposed on the ground that the defendant had not been granted a prior administrative hearing as assertedly required by Section 8a(7) of the Agricultural Marketing Agreement Act, 7 U.S.C. § 608a.[14] The court found that the authorized hearing procedure was merely intended to provide the Agriculture Department with an alternative means for investigating possible violations of its regulations and that no hearing was necessary where a violation had been discovered through other means. The court reasoned that the practicalities of the situation, i. e., under the defendant's view of Section 8a(7) each refusal by a milk handler to make payments would require a hearing, militated against treating the hearing requirement as a condition precedent to a suit for payment. Id. at 610. Contrariwise, the practicalities of effectively and fairly enforcing the Commission's cease and desist orders, discussed above, militate in favor of treating the requirements of Section 16 as a jurisdictional prerequisite to a Section 5(l) civil penalty suit.

Finally, the fact that the certification procedure has in the past been rigidly adhered to by the Commission and the Attorney General attests to the desirability of restricting the interpretation and enforcement of the Commission's orders to the Commission. This suit marks the first time in the 27-year history of the 1938 amendments in which the Attorney General has proceeded under Section 5(l) without FTC certification pursuant to Section 16. While agen-

13. In recent years, more than 75% of the Commission's formal cases have been disposed of by consent orders. Dixon, Practice and Procedure Before the Federal Trade Commission, 9 N.Y.L.F. 31, 49 (1963); see 1964 FTC Ann.Rep. 31; 1963 FTC Ann.Rep. 4.

14. 7 U.S.C. § 608a provides in pertinent part:
Upon the request of the Secretary of Agriculture, it shall be the duty of the several United States attorneys * * under the directions of the Attorney General, to institute proceedings to enforce the remedies and to collect the forfeitures provided for in, or pursuant to this chapter. Whenever the Secretary, or such officer or employee of the Department of Agriculture as he may designate for the purpose, has reason to believe that any handler has violated, or is violating, the provisions of any order or amendment thereto issued pursuant to this chapter, the Secretary shall have power to institute an investigation and, after due notice to such handler, to conduct a hearing in order to determine the facts for the purpose of referring the matter to the Attorney General for appropriate action.

cy practice does not constitute conclusive proof of legislative intent, consistent adherence to the certification procedure indicates, at the very least, that the Commission and the Attorney General consider it an extremely effective and practical means for enforcing the Commission orders. This is evidenced by the fact that "in forwarding civil penalty cases to the Attorney General for filing in the U. S. District Court, the * * * [Compliance] Division prepares all necessary pleadings and a trial memorandum, and attorneys of the Division usually participate in and often conduct the trials." 1962 FTC Ann.Rep. 61–62; see 1961 FTC Ann.Rep. 55, 58.[15]

The Government notes, however, that the Commission in a letter to the Justice Department during the pendency of this appeal, stated that it does not view certification as jurisdictional, see Letter from FTC to James Buckley, Attorney, Department of Justice, June 28, 1965, and urges that the FTC's construction of the act which it administers is entitled to substantial weight. Under the circumstances, we do not agree. The significance of this recent expression of opinion is not only undermined by years of agency practice to the contrary but it is important to note that the practical reason for disregarding Section 16 here and probably for the above-mentioned view of the FTC, is a recent Third Circuit decision which held that the FTC, while conducting a compliance investigation, cannot obtain access to information produced at a grand jury investigation conducted by the Attorney General. In re Grand Jury Proceedings, 309 F.2d 440 (3d Cir. 1962). Thus, it is unlikely that the FTC could have obtained access to the matters which occurred before the Missouri grand jury that investigated the pricing practices of appellant and it would have had to conduct a separate in-

vestigation to ascertain whether appellant had violated the 1959 order. But, as the Third Circuit noted, the quality of the FTC investigation would not have been impaired by its lack of free access to grand jury evidence since the FTC has plenary power to investigate compliance with its orders and to subpoena witnesses and documents. Id. at 444. In sum, we cannot sanction the abdication of the Commission's duties and responsibilities under the FTCA, especially its duty to predicate certification on a reasonable belief that an order has been violated, for the sake of an administrative shortcut. There is no merit in the Government's *in terrorem* argument that to require a Commission investigation of possible violations of its orders where the Attorney General, as here, is in possession of the relevant evidence would serve no useful purpose and would unduly burden the Government by duplicating investigative effort. The fact that duplication might occur in the sense that the same evidence would be examined by both Government bodies is irrelevant. The crucial point is that the Commission's judgment concerning the legal consequences of the evidence investigated cannot be duplicated, and it is that judgment which Congress intended should form the sole basis for utilizing the civil penalty enforcement mechanism provided in Section 5(*l*).

To conclude, we hold that Congress intended Section 16 of the FTCA to be jurisdictional, not directory, and that its requirements must be satisfied by the FTC prior to the commencement of a civil penalty suit by the Attorney General under Section 5(*l*). This view of the interrelationship between Sections 5(*l*) and 16 is both fair and reasonable in view of the Commission's extensive investigative powers; experience and pre-occupation with trade reg-

---

15. It is also significant that, although many civil penalty suits are settled prior to trial and the terms and conditions of settlement are controlled by the Attorney General, he always obtains "the Commission's views prior to any settlement as to whether the settlement under all the circumstances would be satisfactory to the Commission." Anderson, Settlement and Compliance Procedures, 14 ABA Section of Antitrust Law, 60, 65 (1959).

ulation; and close relation to its cease and desist orders, evidenced by its compliance report procedures and pre-certification practice. Additionally, it yields the most effective mechanism—free from uncertainty and the threat of inter-governmental conflict—for effectuating the objectives and purposes of the FTCA.

The decision of the district court is reversed, and the case is remanded for disposition consistent with this opinion.

J. JOSEPH SMITH, Circuit Judge (dissenting):

I dissent.

§ 16 of the FTCA, 15 U.S.C. § 56, imposes a duty on the FTC to certify facts to the Attorney General, and a duty on the Attorney General then to cause appropriate proceedings to be brought. Among the appropriate proceedings are those described in § 5(*l*) of the Act, 15 U.S.C. § 45(*l*). That is the connection between the two sections, which of course must be read together. But even when read in conjunction with § 5(*l*), § 16 does not say that the appropriate proceedings may be brought only when certification occurs.

Furthermore, if the Attorney General may exercise discretion after the facts are certified and decline to bring suit, then the FTC's compliance procedures are vexed as much as they are here. Especially in a case such as this, where the FTC requested that the Attorney General bring suit, the FTC and Attorney General are not working at cross-purposes. The certification procedure is not designed to protect the party who may be liable to penalty, but rather to assure that the FTC and Attorney General will act. As the District Court stated, the purpose of the Wheeler-Lea Act was to "put some teeth" into cease and desist orders.

The general duty of the Attorney General is described in 28 U.S.C. § 507, which in § 507(b) says that it is the duty of the Attorney General to supervise all litigation to which the United States is a party, and which in § 507(a) (2) says

that it is the duty of each United States Attorney to "[p]rosecute or defend, for the government, all civil actions, suits or proceedings in which the United States is concerned." To impose a restriction on this duty there should be a clearer direction from Congress than § 16.

I would affirm the order denying the motion to dismiss.