**ALTERMAN FOODS, INC., Petitioner,**
v.
**FEDERAL TRADE COMMISSION,**
Respondent.
No. 73–1960.

United States Court of Appeals,
Fifth Circuit.
July 22, 1974.

Allen I. Hirsch, Cleburne E. Gregory, Jr., Atlanta, Ga., for petitioner.

Robert E. Duncan, Atty., Office of General Counsel, Calvin J. Collier, General Counsel, Harold D. Rhynedance, Jr., Asst. General Counsel, and Gerald Harwood, Asst. General Counsel, Federal Trade Commission, Washington, D. C., for respondent.

Before DYER, MORGAN and RONEY, Circuit Judges.

RONEY, Circuit Judge:

The general question in this case is whether a wholesaler and retailer of groceries and household products violates the Federal Trade Commission Act by inducing its suppliers, at their own expense, to participate in a food show for its buyers and customers, knowing that the suppliers did not so cooperate with its competitors. The Federal Trade Commission found a violation, and we agree.

The case comes to us on a petition of Alterman Foods, Inc. to set aside a Federal Trade Commission cease and desist order. —— F.T.C. ——, Trade Reg.Rep. ¶ 20,248 (Dkt. 8844, Feb. 12, 1973). Alterman is a combination wholesaler and retailer of groceries and household products serving primarily Georgia and Alabama with annual sales exceeding $130 million. It sells to the public at retail from approximately 70 food stores, Big Apple, Food Giant, and K–Mart, which it operates directly or through wholly-owned subsidiaries. Its wholesale division sells exclusively to the "A.B.C. Food Stores," approximately 375 independent grocery stores organized as a voluntary cooperative and under contract to pur-

chase most of their stock from Alterman. The institutional division sells in bulk to restaurants, hotels, hospitals, and other institutions.

Since 1956 Alterman has held an annual "food show" conducted under the jurisdiction of its wholesale division, for the institutional, independent, and supermarket buyers. At the show, suppliers demonstrate their wares to an audience of up to 15,000 managers, co-managers, and employees of the Alterman owned retail outlets, together with their families and friends; independent A.B.C. Store owners, their employees, families, and friends; and customers of the institutional division. The general consuming public is not invited to attend.

The Commission found that the suppliers' involvement in the food show constituted, in connection with the resale of the suppliers' products, promotional allowances and services to Alterman which were not accorded on proportionally equal terms to the suppliers' other customers. The suppliers thus violated sections 2(d) and 2(e) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. 13(d) and (e). The Commission concluded that Alterman, by knowingly inducing and receiving these discriminatory allowances and services, engaged in unfair competition at both wholesale and retail levels in violation of section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45. It issued a cease and desist order.

Seeking to set aside or modify the order, Alterman asserts (1) no retail level violation was proved because the promotional allowances and services were not provided in connection with the retail sale of the suppliers' products; (2) there was no violation of the Act at the wholesale level because no other customers of the participating suppliers competed with Alterman at the wholesale level except one wholesaler as to which any violation was de minimis; (3) in any event, the allowances and services satisfied the tests for proportional equality among the suppliers' customers; and (4) the Commission's order was overbroad.

### Applicable Legal Principles

The Commission determined that Alterman, in inducing suppliers to violate their obligations under the amended Clayton Act, had committed an unfair method of competition proscribed by section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a)(1).[1] The courts have uniformly accepted this use of section 5 to reach buyer conduct not directly proscribed by the prohibitions on sellers established by sections 2(d) and 2(e) of the amended Clayton Act. Colonial Stores, Inc. v. FTC, 450 F.2d 733 (5th Cir. 1971); FTC v. J. Weingarten, Inc., 336 F.2d 687 (5th Cir. 1964), cert. denied, 380 U.S. 908, 85 S. Ct. 890, 13 L.Ed.2d 796 (1965); R. H. Macy & Co. v. FTC, 326 F.2d 445 (2d Cir. 1964); Giant Food Inc. v. FTC, 113 U.S.App.D.C. 227, 307 F.2d 184 (1962), cert. denied, 372 U.S. 910, 83 S.Ct. 723, 9 L.Ed.2d 718 (1963); see FTC v. Fred Meyer, Inc., 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968).

Section 2(d) makes it unlawful for a supplier to pay allowances for advertising or other sales promotion services or facilities provided by one customer who resells the supplier's products unless the allowances are "available on proportionally equal terms to all other customers competing in the distribution of such products."[2]

---

1. 15 U.S.C.A. § 45(a)(1) reads:
 Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

2. Section 2(d), 15 U.S.C.A. § 13(d), provides in full:

It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the

Section 2(e) prohibits a seller from favoring any purchaser with promotional services and facilities "not accorded to all purchasers on proportionally equal terms." [3]

The basic factual elements of the unfair method of competition of inducing discriminatory payments or services violative of the Clayton Act are:

1. that a respondent in commerce knowingly solicited or induced and received from a supplier promotional allowances, services, or facilities;

2. that the solicited promotional considerations were received in connection with the resale of the supplier's product;

3. that the respondent had competitors at the same functional level; and

4. that the respondent knew or should have known that its competitors were not offered the promotional considerations in question on proportionally equal terms.

FTC v. J. Weingarten, Inc., 336 F.2d 687, 693 n. 16 (5th Cir. 1964), cert. denied, 380 U.S. 908, 85 S.Ct. 890, 13 L. Ed.2d 796 (1965); see FTC v. Fred Meyer, Inc., 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968); Commission Guide 14, 16 C.F.R. § 240.14 (1974) (FTC Guides for Advertising Allowances and Other Merchandising Payments and Services).

The Commission's findings are, of course, conclusive if supported by substantial evidence. Colonial Stores, Inc. v. FTC, 450 F.2d 733 (5th Cir. 1971); Foremost Dairies, Inc. v. FTC, 348 F.2d 674 (5th Cir.), cert. denied, 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362 (1965); see 15 U.S.C.A. § 45(c). The Commission has wide discretion in its choice of remedies for unlawful practices, and its determination is not to be disturbed unless the remedy selected "has no reasonable relation to the unlawful practices found to exist." Jacob Siegel Co. v. FTC, 327 U.S. 608, 613, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946); accord, FTC v. Colgate-Palmolive Co., 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965). The Commission is not limited to prohibiting only the precise form of illegal practices found by it. FTC v. Colgate-Palmolive Co., supra; FTC v. Mandel Brothers, 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959).

### Commission's Findings and Order

All of Alterman's suppliers were encouraged to participate in the food show each year. In each year covered by the complaint (1966–1969), approximately 300 suppliers participated. In order to participate, a supplier was required to rent a booth in which to display his products, at a cost of $350 or $375 depending on the year, and to staff the booth in order to display its products. The section 2(d) charge is based on the

---

processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

3. Section 2(e), 15 U.S.C.A. § 13(e), provides in full:

It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so pur-

chased upon terms not accorded to all purchasers on proportionally equal terms.

Although subsections (d) and (e) contain textual variations, they have generally been construed as co-extensive. See, e. g., Exquisite Form Brassiere, Inc. v. FTC, 112 U.S. App.D.C. 175, 301 F.2d 499 (1961), cert. denied, 369 U.S. 888, 82 S.Ct. 1162, 8 L.Ed. 2d 289 (1962); American News Co. v. FTC, 300 F.2d 104 (2d Cir.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962); Elizabeth Arden Sales Corp. v. Gus Blass Co., 150 F.2d 988 (8th Cir.), cert. denied, 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945). See also 1 R. Callman, The Law of Unfair Competition, Trademarks & Monopolies § 28.1 (e) (3d ed. 1967); 2 H. Toulmin, The Anti-Trust Laws of the United States § 13.2 (1949).

profit Alterman derived from the show, approximately $100 per supplier even after an admittedly generous allowance for indirect costs. The section 2(e) allegation stems from the promotional services—supplies and labor—furnished by the participating suppliers.

The Commission found that Alterman knowingly induced suppliers to participate in its food show and thereby received favored allowances and services.[4] The Commission determined that the food show benefited Alterman's retail and wholesale sales. Both Associated Grocers Co-op, Inc. and May & Company of Georgia were wholesale competitors discriminated against by suppliers' participation in the food show. The Promotional considerations accorded by the suppliers discriminated against Alterman's retail competitors both directly and indirectly.

Having found the elements necessary to adjudicate section 5 violations at both wholesale and retail levels, the Commission issued an order which prohibits Alterman from inducing and receiving from a supplier promotional services or facilities, or anything of value in exchange for promotional consideration provided by Alterman, when Alterman knows or should know that the promotional considerations it obtains are not made available by the supplier on proportionally equal terms to all other customers competing with Alterman in the distribution of the supplier's products. The term "customers" includes retail customers who do not purchase directly from the supplier. As to the operation of future food shows, the order requires Alterman to bear its proper share of the operating expenses and to repay any profit on a show to all participants pro rata. Alterman must deliver a copy of the Commission's order to everyone invited to participate in a food show.

*Retail Sales*

Alterman argues that the Commission erred in finding a violation at the retail level of distribution on the ground that the food shows are solely wholesale promotions and the promotional allowances and services provided by the suppliers were not "in connection with" resale of the suppliers' products to retail customers. The Commission reasoned that the suppliers' booths, displays, and demonstrations aided Alterman's retail operation both indirectly and directly: indirectly, by giving special information to those involved in retail sales on how to display and market their products most effectively, thus giving them an advantage over their retail competitors; and directly, by the profit made by Alterman's wholesale division from the show, which could in turn reduce the profit margin it needed from the sale of products through its retail division in order to achieve an appropriate overall corporate profit.

Alterman cites the Administrative Law Judge's finding that the food shows were wholesale promotions and that the promotional services did not facilitate retail sales. In support of this position, Alterman notes that the consuming public was not invited to attend the food shows and that there was no general advertising of shows. In addition, it points out that, although personnel from Alterman's retail outlets were invited to the shows, they were not permitted to purchase from suppliers there and were not eligible for free orders and prizes offered by suppliers. Alterman also contends that the Commission did not prove that the profits on food shows were used by the retail division and thus did not prove discriminatory allowances in connection with resale at retail.

■■ We should note that the Commission, rather than the Administrative

---

4. The Administrative Law Judge's finding that Alterman had sufficient information and experience that it should have known that similar offers had not been made to the grocery trade establishes the requisite element of scienter. *See, e. g.,* Colonial Stores, Inc. v. FTC, 450 F.2d 733, 744–745 (5th Cir. 1971); American News Co. v. FTC, 300 F. 2d 104, 110 (2d Cir.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962).

Law Judge, bears the ultimate responsibility of decision and may, therefore, reach results contrary to those of its hearing officer. Findings substituted by the Commission, if supported by substantial evidence, control. Mississippi River. Corp. v. FTC, 454 F.2d 1083, 1089 (8th Cir. 1972); Art National Manufacturers Distributing Co. v. FTC, 298 F.2d 476, 477 (2d Cir.), cert. denied, 370 U.S. 939, 82 S.Ct. 1588, 8 L.Ed.2d 808 (1962); cf. NLRB v. Seafarers International Union, 496 F.2d 1363, 1364 (5th Cir. 1974).

■ The record contains substantial evidence supporting the Commission's determination that the food shows were in connection with Alterman's retail resales of the participating suppliers' products. Suppliers were invited by Alterman's buyers who purchased for the Company's retail division as well as for its wholesale business. The Alterman vice-president in charge of retail operations testified that the Company's retail stores and their managers definitely benefit from the food shows. Company literature encouraging retailers to attend the shows stresses the benefits to them of participation. The store managers have general discretion in stocking their stores. By going to a food show, a manager can acquire information on new products. He can also observe methods of promoting sales and building up his store. According to another Alterman vice-president, the food shows "cement the relationship between a food supplier and the retailer." Thus, the suppliers' promotional services at food shows benefited Alterman at the retail level.

■ The profits on booth rentals were, in effect, price reductions on suppliers' products. See Grand Union Co. v. FTC, 300 F.2d 92, 99 (2d Cir. 1962). Although, as Alterman argues, there is no formal proof that its profits on the food shows were put to use at the retail level, the Commission could properly infer that this additional source of profit enabled the Company to maintain a given overall profit level while charging less in its other operations, an advantage denied to Alterman's competitors. This inference lies within the competence of the Commission and constitutes substantial evidence in the absence of contrary evidence produced by Alterman. See Colonial Stores, Inc. v. FTC, 450 F. 2d 733, 739 n. 13, 741 nn. 17 & 18 (5th Cir. 1971).

### Wholesale Competition

■ Alterman attacks the Commission's finding that Associated Grocers is "as a practical matter" based on "the market realities" in competition with Alterman at the wholesale level. In the broad range of possible functional organizations, a retailer-owned buying cooperative, such as Associated Grocers, may serve as the common agent of individual retailer-members, as their wholesaler, or as something in between. Classification as to function is the province of the trier of fact. Fred Meyer, Inc. v. FTC, 359 F.2d 351, 361 (9th Cir. 1966), rev'd in part on other grounds, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968).

■ We find the Commission determination that Associated Grocers' headquarters was Alterman's functional competitor supported by substantial evidence. Associated Grocers' headquarters performs functions similar to Alterman's operation of its voluntary cooperative for A.B.C. Stores. Each maintains substantial inventories of suppliers' products, purchased directly in its own name, in a large warehouse. Each sells products at wholesale prices and delivers them to affiliated independent retail stores. There is some degree of competition between the two organizations for the business of existing and new independent retail outlets. Finally, there was testimony that, during the years covered by the complaint, Alterman and Associated Grocers were the only two major sources in the Atlanta trade area offering retailers a full line of grocery supplies. This is sufficient evidence to support the Commission's finding that Alterman's wholesale division and Asso-

ciated Grocers' headquarters are in basic competition for wholesale business. *See* Tri-Valley Packing Association v. FTC, 329 F.2d 694, 706–709 (9th Cir. 1964); Alhambra Motor Parts v. FTC, 309 F.2d 213 (9th Cir. 1962); *cf.* Central Retailer-Owned Grocers, Inc. v. FTC, 319 F.2d 410 (7th Cir. 1963).

Alterman asserts a crucial distinction in that Associated Grocers is owned by the retailers which it serves. Any profits from the headquarters operation are returned to the members. In contrast, any profit from Alterman's wholesale division belongs to the Company, not to the A.B.C. Stores. The dispositive criterion, however, is the functional level at which the activities take place. Nothing in FTC v. Fred Meyer, Inc., 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), indicates that ownership of a functional wholesaler by its customers would prevent the Commission from reaching otherwise illegal conduct.

■ Even assuming arguendo that Associated Grocers was not a wholesale competitor of Alterman, we reject Alterman's *de minimis* contention. The Company points out that May & Co. was shown to have competed with Alterman in the distribution of the products of only one small supplier of the 300 participating in the food shows, and that that supplier rented only half a booth in two shows for which it paid a total of $375. Alterman argues that any resultant disfavoring of May & Co. had relatively little effect on competition.

■ Proof of injury to competition, however, is not required to show prima facie violations of sections 2(d) and (e). *See* FTC v. Simplicity Pattern Co., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed. 2d 1079 (1959); R. H. Macy & Co. v. FTC, 326 F.2d 445 (2d Cir. 1964); Giant Food Inc. v. FTC, 113 U.S.App.D. C. 227, 307 F.2d 184 (1962), cert. denied, 372 U.S. 910, 83 S.Ct. 723, 9 L.Ed. 2d 718 (1963). Solicitation of discriminatory promotional consideration is *per*

*se* illegal. R. H. Macy & Co. v. FTC, *supra*; American News Co. v. FTC, 300 F.2d 104 (2d Cir.), cert. denied, 371 U. S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962). In any event, the supplier in question, which had a limited product line and a low profit margin, did not usually participate in food shows. Commission counsel tried the case by using seven suppliers as examples to illustrate Alterman's violations. The Commission was not required to prove all possible violations by Alterman with the 300-odd participating suppliers to justify a cease and desist order. In this context it cannot be said that Alterman's use of its buying power to obtain discriminatory promotional allowances and services was "negligible or inconsequential in the sense of being de minimis." Shreveport Macaroni Manufacturing Co. v. FTC, 321 F.2d 404, 409 (5th Cir. 1963), cert. denied, 375 U.S. 971, 84 S.Ct. 491, 11 L. Ed.2d 418 (1964). This is particularly so because the Commission has the authority to nip potentially destructive practices in the bud. *See* FTC v. Simplicity Pattern Co., 360 U.S. 55, 68, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959). It was enough in this case that the Commission demonstrated that Alterman knowingly solicited and obtained promotional considerations not available to a competitor.

### Proportional Equality

The Commission found that the food show participation and booth rental by suppliers was discriminatory. This finding rested on a determination that these promotional considerations were not available to competitors.

Alterman contends that the food show promotional considerations complied with the tests for proportional equality. It points out that the cost of booth rental was a very small percentage of the amount of suppliers' sales to Alterman and that the suppliers received fair value in terms of promotional exposure for the amounts they paid. [5]

---

5. Among the seven illustrative suppliers, the highest percentage was just over 3%.

There was testimony that it would have cost one supplier $1500 to reach independently

 Alterman's arguments miss the point. To avoid being discriminatory, promotional payments and services must be made "available" or "accorded" to competing customers of the suppliers. To meet this requirement, a supplier must not merely be willing, if asked, to make an equivalent deal with other customers, but must take affirmative action to inform them of the availability of the promotion programs. Fred Meyer, Inc. v. FTC, 359 F.2d 351, 360 n. 10 (9th Cir. 1966), rev'd in part on other grounds, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968); Commission Guide 8, 16 C.F.R. § 240.8 (1974); *see* Vanity Fair Paper Mills, Inc. v. FTC, 311 F.2d 480 (2d Cir. 1962); Exquisite Form Brassiere, Inc. v. FTC, 112 U.S. App.D.C. 175, 301 F.2d 499 (1961), cert. denied, 369 U.S. 888, 82 S.Ct. 1162, 8 L. Ed.2d 289 (1962). Thus, while promotional benefits received may be considered in determining proportional equality, the basic question is one of proportionality of offers. Colonial Stores, Inc. v. FTC, 450 F.2d 733, 744 (5th Cir. 1971). Once the Commission had shown that only Alterman had received special payments and services, the burden of proving the availability of similar payments to its competitors was on Alterman. R. H. Macy & Co. v. FTC, 326 F. 2d 445, 450 (2d Cir. 1964); *see* State Wholesale Grocers v. Great Atlantic & Pacific Tea Co., 258 F.2d 831, 838 (7th Cir. 1958), cert. denied, 358 U.S. 947, 79 S.Ct. 353, 3 L.Ed.2d 352 (1959). The record makes plain, however, that suppliers were either unwilling or unable to extend similar promotional considerations to all other customers.[6]

*Scope of the Order*

Based on its finding of 2(d) and 2(e) violations in connection with Alterman's food shows, the Commission not only placed restrictive conditions on future food shows but also broadly prohibited Alterman from inducing and receiving promotional considerations which it knows or should know are not offered to others in violation of sections 2(d) and 2(e). Alterman argues that the Commission's order is overly broad and that we should modify it to enjoin only section 5 violations arising from food show activities.

 The Commission has broad discretion in the formulation of its decrees. Here the Commission has limited its order to those types of section 5 violations in which it found Alterman to have engaged, *i. e.*, inducing from its suppliers payments and services violative of sections 2(d) and 2(e). The terms of the order closely parallel the provisions of 2(d) and 2(e) but do not extend beyond them. Such orders have often been upheld against contentions of overbreadth. *See, e. g.*, FTC v. Ruberoid Co., 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081 (1952); Electric Bond & Share Co. v. SEC, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936 (1938); P. Lorillard Co. v. FTC, 267 F.2d 439 (3d Cir. 1959). The Commission has proscribed future conduct of the same general type as the illegal business practices it found. Thus, the proscriptions are reasonably related to the violations uncovered at the hearing.

Alterman makes general allegations of uncertainty in the meaning of the order. In FTC v. National Lead Co., 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957), the subjects of a comprehensive cease and desist order posed hypothetical situations which they claimed might subsequently cause them considerable difficulties. The Supreme Court rejected their

---

the A.B.C. retailers present at the food shows.

**6.** This does not mean that offers to participate in non-existent food shows would have sufficed. For another aspect of "availability" is that the promotional payments or services in question must be useful and suitable to competing customers or useable and appropriate alternatives must be offered. State Wholesale Grocers v. Great Atlantic & Pacific Tea Co., 258 F.2d 831, 838–839 (7th Cir. 1958), cert. denied, 358 U.S. 947, 79 S. Ct. 353, 3 L.Ed.2d 352 (1959); Elizabeth Arden Sales Corp. v. Gus Blass Co., 150 F. 2d 988, 994–995 (8th Cir.), cert. denied, 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945) Commission Guide 9, 16 C.F.R. § 240.9.

**1002**

arguments, noting that the companies could apply to the Commission for advice, if such situations developed, and present the questions "in evidentiary form rather than as fantasies." *Id.* at 431. *Accord* FTC v. Colgate-Palmolive Co., 380 U.S. 374, 394, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965); *see* 16 C.F.R. § 3.-61(d) (1974).

*Conclusion*

The Commission's determinations being supported by substantial evidence and in accordance with law, and the scope of the order being reasonably related to the nature of the violations found, we deny the petition for review and order the Commission's cease and desist order enforced in its entirety. *See* 15 U.S.C.A. § 45(c).

Petition for review denied and cease and desist order enforced.