**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-3024

_____

OROLOGIO OF SHORT HILLS INC;
OROLOGIO INTERNATIONAL LTD INC,
                                                    Appellants

v.

THE SWATCH GROUP (U.S.) INC.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-11-cv-06854)
District Judge: Honorable Susan D. Wigenton

_____

Submitted under Third Circuit LAR 34.1(a)
on June 10, 2016

Before:  CHAGARES, KRAUSE, and SCIRICA, *Circuit Judges*

(Opinion filed: June 24, 2016)

_____

OPINION*

_____

KRAUSE, *Circuit Judge*.

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Appellants Orologio of Short Hills and Orologio International Ltd. (collectively, "Orologio") seek reversal of the District Court's order (1) granting summary judgment to Appellee Swatch Group on Orologio's claims under the New Jersey Franchise Practices Act (FPA), N.J. Stat. Ann. § 56:10-1 to -15, and § 2(d), (e) of the Robinson-Patman Act (RPA), 15 U.S.C. § 13(d), (e), (2) denying Orologio's motion for partial summary judgment on its RPA claims, and (3) denying Orologio's "Motion for an order striking [Swatch's] answer in part and impos[e] other sanctions based upon [Swatch's alleged] spoliation of evidence." We conclude that the District Court properly granted summary judgment on the FPA claim, erred in granting summary judgment on the RPA claims, and did not abuse its discretion in denying the motion to strike and for sanctions. We will thus affirm in part and reverse in part, remanding the case for proceedings consistent with this opinion.

## I.    Background[1]

Orologio operates a business in The Mall at Short Hills in Millburn, New Jersey, selling high-end watches of various brands. Since 1994 this top-notch watch shop was an authorized dealer of Swatch's premier "Omega" brand of watches, famed, among other things, for their use by the fictional international super-spy James Bond. While there was no formal, written contract between Orologio and Swatch,[2] the two had, by all accounts,

_____

[1] Because we write primarily for the parties, we provide background only as relevant to the issues on appeal.

[2] Indeed, according to Swatch, it has no formal contract or license agreement with any of its authorized retailers, relying instead on various voluntary programs and internal, year-to-year agreements setting forth certain standards that must be met to continue

what appeared to be a durable business relationship in which Orologio purchased Omega watches for resale, was permitted to display Swatch's trademarks, and benefited from advertising assistance from Swatch. This relationship hummed along until 2011, when Swatch terminated its relationship with Orologio because Swatch planned to open its own company store in The Mall at Short Hills. In its Complaint, Orologio avers that, at the time of the termination, Omega sales accounted for roughly 25% of Orologio's total revenue. Nonetheless, after losing its status as an Omega dealer, Orologio's business increased until at least 2014.

Swatch provides a number of promotional benefits to retailers that sell its products, four of which are particularly relevant to this case. First, under the Partner Plan, a voluntary program between Swatch and a given Omega dealer, retailers earn from Swatch a monetary credit if they achieve a previously-set minimum retail sales threshold, and that size of the credit increases with the amount of sales once the threshold is passed. Orologio received credits under the Partner Plan in 2004 and 2005, but it failed to reach the threshold necessary to earn credits in subsequent years. Second, retailers may apply for co-op support, through which Swatch provides funds to select retailers to help defray the costs of specific, additional advertising (though some degree of cost sharing between the retailer and Swatch is expected). Orologio's president has stated that the shop has received co-op support "over [its] more than 20-year relationship" with Swatch, with the most recent successful application providing funds in 2006. Third, Swatch at times

receiving Swatch's merchandise for resale. Swatch avers that either party may end the buyer-seller relationship at any time.

would invest in "tagging," which amounts to advertisements (e.g., billboards, television commercials, and magazine ads) funded entirely by Swatch that feature the name of a specific retailer. Fourth, Swatch has offered "slotting fees" to at least one Omega retailer, whereby Swatch pays a premium in order to ensure Omega watches are displayed in an especially advantageous spot in a given store.

In 2007, things changed. Under new management, Swatch imposed new restrictions and requirements on authorized Omega dealers, compliance with which was required in order to retain their buyer-seller relationship with Swatch's Omega line. The most dramatic change was a requirement that any authorized retailer maintain at least sixty-five timepieces in its inventory at any given time. Despite the increase in financial investment this uptick in inventory would require, Orologio wanted to preserve its access to Omega products and thus agreed to make the change.[3] Orologio also claims the Partner Plans fundamentally changed in January 2008, shifting the rewards available to retailers who reached agreed-upon thresholds from monetary credits on future inventory purchases to funds for promotional and advertising support—i.e., co-op funds. According to Orologio's president and the owner of another specialty watch shop, Swatch represented the newly formulated Partner Plan as the *exclusive* means of accessing co-op funding, thus eliminating the separate application process. Swatch

_____

[3] The record is far from clear as to whether this new sixty-five piece requirement was associated with a change in the Partner Plan or with a so-called Selective Distribution Program. *Compare* App. 8, 1122 (indicating that the Partner Plans imposed the new requirement), *with* App. 573 (indicating the "Selective Distribution Program" imposed the requirement). For purposes of this case, only the fact that Orologio took on this new responsibility is relevant.

4

disputes this characterization, insisting that meeting the targets under the Partner Plan to trigger credits was not required for receipt of co-op funds.

Orologio discovered that some of its competitors were, in fact, receiving co-op funds even without participating in the new Partner Plan and insists that these co-op decisions were not only done behind Orologio's back but were also doled out at Swatch's whim without any objective standards guiding which retailers received co-op funds. Meanwhile, Orologio also discovered that some of its competitors had benefited from tagged ads and slotting fees—benefits Orologio insists were not offered to it at any time and were not based on any objective criteria.

In 2011, upon being dropped as an authorized Omega dealer, Orologio brought suit first in New Jersey state court, alleging that, under the FPA, N.J. Stat. Ann. § 56:10-4, it was a franchisee of Swatch and that Swatch's termination of their business relationship without cause thus violated New Jersey law, *id.* § 56:10-5. The state court denied Orologio relief. Orologio filed its Complaint in federal court a few months later, seeking declaratory and injunctive relief for its FPA claim along with claims under § 2(d), (e) of the Robinson-Patman Act, 15 U.S.C. § 13(d), (e), and a state law claim for breach of the covenant of good faith and fair dealing. Orologio's RPA claims rest on the idea that Swatch failed to provide promotional benefits to all its authorized Omega dealers in a way that was "available on proportionally equal terms." 15 U.S.C. § 13(d). Orologio claims Swatch failed to meet that bar (1) by not providing notice that co-op funds were available outside the Partner Plan nor that tagging and slotting fees were on

the table, and (2) by offering co-op support, tagging, and slotting fees in an ad hoc manner rather than through the use of objective criteria.

During the pendency of this litigation, Swatch authorized the destruction of hard-copy tapes containing the tagged television commercials it funded for other authorized Omega dealers. Based on the evidence in the record, the tapes were destroyed without reference to this litigation and for the sole reason that Swatch no longer wished to pay a storage company to house the tapes. Orologio points to the destruction of these tapes as spoliation of evidence because Gregory Swift—the brand manager for Omega watches—was copied on the emails regarding their destruction, and he had been put on notice years earlier by Swatch's counsel not to allow the destruction of emails and "any other documents" relating to the Orologio litigation.

In early 2015, Orologio and Swatch filed cross motions for summary judgment, with Swatch seeking judgment on all counts and Orologio seeking judgment solely on its RPA claims. Orologio also moved to strike Swatch's Answer and impose other sanctions based on the alleged spoliation of evidence. The District Court found in favor of Swatch on all counts and entered a corresponding order. Orologio timely filed this appeal, seeking reversal of the District Court's grant of summary judgment on the FPA and RPA claims and reversal of the District Court's dismissal of the motion to strike and issue sanctions.[4]

---

[4] The District Court opinion does not reference Orologio's breach of the covenant of good faith and fair dealing claim, but we assume that, in finding there was no FPA violation nor an RPA violation, the District Court intended either to grant summary judgment in Swatch's favor on that claim as well or to dismiss it for lack of supplemental

## II.     Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367, and we have jurisdiction to review its final order under 28 U.S.C. § 1291.  We exercise plenary review over a grant of summary judgment, applying the same standard employed by the District Court.  *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 395 (3d Cir. 2015).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Meanwhile, we review a denial of a motion to strike and issue sanctions based on spoliation of evidence for abuse of discretion.  *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012); *Meditz v. City of Newark*, 658 F.3d 364, 367 n.1 (3d Cir. 2011); *Complaint of Consolidation Coal Co.*, 123 F.3d 126, 131 (3d Cir. 1997).

## III.     Discussion

Upon review, we conclude that the District Court properly entered summary judgment in favor of Swatch on Orologio's FPA claim and did not abuse its discretion in denying Orologio's motion to strike and issue sanctions.  However, because we perceive genuine dispute over issues of material fact as to Orologio's RPA claims, we will reverse the District Court's decision to grant summary judgment on those claims and remand for further proceedings.

jurisdiction once the federal RPA claims were disposed of.  In any event, Orologio does not raise this issue on appeal and it is thus waived for our purposes.  *See, e.g.*, *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.").

### A. FPA Claim

Orologio claims its relationship with Swatch was a franchise under the FPA and that its termination without cause was thus in violation of New Jersey law. The FPA makes it unlawful for a franchisor to "terminate, cancel, or fail to renew a franchise without having first given written notice setting forth all the reasons for such [action] at least 60 days in advance" or to take such action without good cause. N.J. Stat. Ann. § 56:10-5. While there are a number of additional requirements a franchisee must meet before it can benefit from the FPA, *see id.* § 56:10-4, a business must first demonstrate that its business relationship meets the threshold definition of "franchise" under the statute:

> "Franchise" means a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

*Id.* § 56:10-3(a).

We agree with the District Court that Orologio was not a franchisee of Swatch and that its FPA claim therefore fails as a matter of law. While the District Court considered each component of the franchise definition, we need not consider the presence or absence of a written arrangement or a license because we are satisfied that there was no community of interest between Orologio and Swatch in this case.

We have characterized the community of interest analysis as a balancing test in which a court considers four factors: "(1) licensor's control over the licensee, (2) the licensee's economic dependence on the licensor[,] (3) disparity in bargaining power, and

8

(4) the presence of a franchise-specific investment by the licensee."[5] *Cassidy Podell*

*Lynch, Inc. v. SynderGeneral Corp.*, 944 F.2d 1131, 1140 (3d Cir. 1991); *cf. Instructional*

*Sys., Inc. v. Comput. Curriculum Corp.*, 614 A.2d 124 (N.J. 1992) (considering similar

factors and citing favorably to *Cassidy* and our other recitations of the community of

interest test). The community of interest inquiry is designed to advance the FPA's main

concern: "that once a business has made substantial franchise-specific investments it

loses all or virtually all of its original bargaining power regarding the continuation of the

franchise . . . [and] has no choice but to accede to the demands of the franchisor, no

matter how unreasonable those demands may be." *Instructional Sys.*, 614 A.2d at 141.

To find a community of interest, the alleged franchisee must "establish that it was subject

to the whim, direction and control of a more powerful entity whose withdrawal from the

relationship would shock a court's sense of equity." *Colt Indus. Inc. v. Fidelco Pump &*

*Compressor Corp.*, 844 F.2d 117, 120-21 (1988).

The New Jersey Supreme Court determined in *Instructional Systems* that a

franchisee had a community of interest with its franchisor where the franchisee sold *only*

the franchisor's product, was forbidden by its agreement with the franchisor to sell

competing products, had made significant franchise-specific investments, and jointly

cooperated with the franchisor in "sales, marketing, and maintenance activities." 614

A.2d at 140-46. In reaching this conclusion, the court contrasted the franchise

---

[5] This formulation of our community of interest test uses the terms "licensor" and "licensee," but because we decline to rule on whether Swatch granted Orologio a license, these terms—for purposes of this opinion—should be considered to mean "purported franchisor" and "purported franchisee," respectively.

9

relationship in that case with the relationships at issue in cases where we have determined there was no community of interest. *Id.* In *Cassidy*, for example, we determined there was no community of interest where the investment in skills and the customer base associated with the purported franchisor were transferrable to future business endeavors, and we observed that "a community of interest exists when . . . the nature of the franchise business requires the licensee . . . to make a substantial investment in goods or skills that will be of minimal utility outside the franchise." 944 F.2d at 1143-44; *accord Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 270 (3d Cir. 1995). Likewise, in *New Jersey American, Inc. v. Allied Corp.*, we concluded there was no community of interest where a retailer relied (and could continue to rely) on a number of suppliers other than the alleged franchisor and had not been required to heavily invest in franchise-specific equipment or goodwill. 875 F.2d 58, 63-65 (3d Cir. 1989). *See also Neptune T.V. & Appliance Serv., Inc. v. Litton Microwave Cooking Prods. Div., Litton Sys., Inc.*, 462 A.2d 595, 597, 603 (N.J. Super. Ct. App. Div. 1983) (finding no community of interest where, among other reasons, the purported franchisee obtained only 38% of its revenue from the alleged franchisor).

Looking to the factors we outlined in *Cassidy*, we agree with the District Court's conclusion that there was no community of interest between Orologio and Swatch. First, as evidenced by the characterization of *Neptune T.V.* in *Instructional Systems*, New Jersey courts are not persuaded that there is a community of interest even where an alleged franchisee obtains 38% of its revenue from the alleged franchisor. *Instructional Sys.*, 614 A.2d at 142 (citing *Neptune T.V.*, 462 A.2d at 597). Here, Orologio alleges in

10

its Complaint—though it does not direct us to record evidence—that it obtained nearly 25% of its revenue from Omega sales—far less than 38%. App. 1441. Moreover, as in *New Jersey American, Inc.*, Orologio obtained watches from a number of other suppliers, and it thrived after losing its Omega retailer status, making it clear that Orologio was not economically dependent on Swatch. 875 F.2d at 59, 63; *see also Cooper*, 63 F.3d at 272 (characterizing economic dependence as "perhaps the 'most important' factor in determining whether a community of interest exists.").

Second, Orologio alleges it made two types of franchise-specific investments during its relationship with Swatch: (1) inventory to comply with the requirement that it maintain sixty-five timepieces at all times, and (2) marketing, advertising, and training costs. Orologio's large investment in Omega inventory for resale was arguably specific to the alleged franchise, but Swatch offered to buy back existing inventory after it terminated its relationship with Orologio, rendering such investment irrelevant for assessing the community of interest. In addition, some amount of marketing and advertising investments are par for the course for any store that sells products manufactured by a supplier, and we decline to hold that—without more—marketing the items on the shelf is sufficient to create a community of interest. Moreover, there is no evidence that the investments in employee knowledge about Omega were mandatory, *see* App. 574 (explaining that Omega offers "voluntary and free of charge seminars and training sessions to its dealers"), nor is there evidence indicating such investments would not be transferrable to other high-end watch brands that Orologio sells. In the absence of

11

required, non-recoupable investments, we cannot agree with Orologio that it lacked bargaining power with Swatch sufficient to create a community of interest.

Third, we discern no significant level of "control" exerted by Swatch over Orologio. While Orologio's ability to sell Omega watches was predicated on rules and limitations imposed by Swatch, these requirements are not "so burdensome as to create the unfettered control typically present in a franchise relationship." *Cassidy*, 944 F.2d at 1141. Moreover, Orologio had the option to agree to these terms and make the concomitant investments or instead recalibrate its business to rely on its other watch brands—a reality we believe undermines any argument that Orologio is firmly under Swatch's thumb.

Accordingly, we conclude that the District Court was correct to determine there is no evidence in the record to create a genuine issue of material fact that might support finding a community of interest between Orologio and Swatch. Because this conclusion is sufficient to affirm the District Court on the FPA claim, we do not address whether the various writings and business dealings Orologio points to in support of the presence of a "written arrangement" or "license" sufficient to create a franchise under the definition in N.J. Stat. Ann. § 56:10-3.

**B. RPA Claims**

Section 2(d) of the RPA "makes it unlawful for a supplier in interstate commerce to grant advertising or other sales promotional allowances to one 'customer' who resells the supplier's 'products or commodities' unless the allowances are 'available on proportionally equal terms to all other customers competing in the distribution of such

12

products or commodities.'" *F.T.C. v. Fred Meyer, Inc.*, 390 U.S. 341, 343 (1968) (quoting 15 U.S.C. § 13(d)).[6]  In practice, this means that entities like Swatch that provide products to retailers like Orologio may not offer promotional assistance—e.g., the Partner Program, co-op funding, tagging, and slotting fees at issue here—to its retailers unless (1) the programs are administered based on some objective, "proportionally equal" criteria, rather than at the whim of the supplier, and (2) all retailers that compete with one another are *on notice* of the availability of such programs.  16 C.F.R. § 240.9 (allowing "[a]ny method that treats competing customers on proportionally equal terms" and suggesting that "basing the payments made . . . on the dollar volume or on the quantity of the product purchased during a specified period" is the easiest way to accomplish such fairness); 16 C.F.R. § 240.10(b) ("The seller has an obligation to take steps reasonably designed to provide notice to competing customers of the availability of promotional services and allowances."); *see also* 16 C.F.R. § 240.8 ("A seller who makes payments or furnishes services that come under the Act should do so according to a plan. . . .  The seller should inform competing customers of the plans available to them, in time for them to decide whether to participate.").

---

[6] Section 2(e) of the RPA imposes essentially the same requirements on promotional *services* as § 2(d) imposes on promotional payments.  15 U.S.C. § 13(e) ("It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale . . . by contracting to furnish or furnishing . . . any services or facilities connected with . . . such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.").  The regulations pertaining to § 2(e) are the same as those pertaining to § 2(e), *e.g.*, 16 C.F.R. § 240.9, and we therefore analyze Orologio's § 2(d), (e) claims together.

13

The District Court granted Swatch summary judgment on Orologio's RPA claims for two independent reasons: (1) that Orologio failed to provide record evidence of who its competitors are; and (2) that, even if it had, the Partner Plan, co-op funding, tagging, and slotting fees were "available on proportionally equal terms." We disagree on both fronts.

### i. Identifying Orologio's Competitors

Section 2(d) of the RPA only applies when competitors at the "same functional level" have unequal access to promotional benefits provided by a supplier. *See Fred Meyer, Inc.*, 390 U.S. at 349, 356; *see also F.T.C. v. Simplicity Pattern Co.*, 360 U.S. 55, 62-64 (1959) (operating from the premise that competition is required for both § 2(d) and § 2(e) claims). It is the claimant's responsibility to identify its competitors and demonstrate they compete at the same functional level. *See George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 141-42 (2d Cir. 1998) (determining that a complaint sufficiently alleged the presence of "functional competition between purchasers of a commodity" in a § 2(d), (e) case). The District Court granted summary judgment against Orologio's RPA claims in part because it determined "Orologio fail[ed] to carry its burden in demonstrating who its actual competitors are." App. 17.

According to the District Court, Orologio's only evidence that it was in competition with nearby Omega dealers was the Fruda deposition, which listed "all Omega dealers that obtained co-op assistance in Connecticut, New Jersey, New York, and Pennsylvania." *Id.* at 18. The District Court was "not persuaded that all Omega dealers that received co-op assistance [in that geographic area] were in fact competitors"

14

of Orologio and found that "the record is devoid of evidence of any competition between the dealers." *Id.* Similarly, the District Court found a lack of evidence as to whether the Omega dealers that received tagged advertisements from Swatch were, in fact, in competition with Orologio. *Id.* We cannot agree.

As pointed out in its brief, Orologio presented the expert report of Joao C. Dos Santos, which used Orologio's historical customer data to calculate the relevant geographic market in which Orologio competes: New Jersey, Manhattan, Long Island, southern and eastern New York, Connecticut, and eastern Pennsylvania.[7] The Dos Santos report further identified more than twenty Orologio competitors in that market, fifteen of which had received some co-op funding between January 2006 and December 2013. At the very least, the Dos Santos report presents a genuine issue of material fact as to Orologio's competitors that warranted consideration by a finder of fact.

The District Court also stated that Orologio did not offer any evidence that it lost sales to competitors that received tagged ads from Swatch. App. 18. We see two problems with this determination. First, there is a report in the sealed appendix that calculates lost revenue as a result of tagging, thus creating at least a dispute of fact on this point. *See* App. 2580. Second and more fundamentally, RPA claims brought under § 2(d), (e) do not require proof of competitive injury. *Simplicity Pattern Co.*, 360 U.S. at 65. Unlike the more commonly brought price discrimination claims under § 2(a) of the

---

[7] Because it contains proprietary information, the actual Dos Santos Report was filed under seal. We refer only to characterizations made in Orologio's publicly-filed brief on appeal. For the District Court's benefit, the portion of the report defining the relevant market may be found at App. 2551-59.

15

RPA, "the proscriptions [under § 2(d), (e)] are absolute," meaning that a violation of § 2(d) or § 2(e) is unlawful regardless of a showing of competitive injury. *Id.* Thus, the District Court was wrong to grant summary judgment on this basis as well.

### ii. "Available on Proportionally Equal Terms"

In a few short sentences, the District Court held that summary judgment on the RPA claims was appropriate because the Partner Plan, co-op funding, tagging, and slotting fees were available on proportionally equal terms to Orologio and all of its alleged competitors. We do not believe the record supports this conclusion.

As to the Partner Plan and co-op funding, it appears the District Court misunderstood the crux of Orologio's RPA claims. As stated in its brief on appeal, Orologio never argued that the Partner Plan—the voluntary plan through which it could earn credits for meeting certain sales thresholds—itself violated the RPA. Appellant's Br. 52-53. Rather, Orologio's chief complaint centers on its claim that the terrain changed after 2007 when Swatch represented to Orologio that co-op funding was *exclusively* available via participation in the Partner Plan despite still providing co-op funding to other competitors who did *not* participate in the Partner Plan. Thus, the District Court's determination that Orologio had adequate notice of the co-op policy because "it had received co-op advertising support 'over the more than 20-year relationship,' including in 2006," App. 19, misses the mark: Orologio claims the Partner

Plan *and* access to co-op funding fundamentally changed in 2007, meaning that its understanding of the co-op policy pre-2007 is immaterial to its RPA claims.[8]

Once Orologio's RPA claims related to co-op funding is properly understood, it becomes clear that the record contains sufficient evidence to raise disputed questions of material fact on this issue. First, there are two declarations indicating that Swatch represented to at least some of its retailers that participation in the Partner Plan was the exclusive way to access co-op funds. App. 1573-74 (declaration by Orologio's president stating the Partner Plan was represented to him as the only way to access co-op funds); *id.* at 1463-64 (same from an alleged Orologio competitor). Yet, there is also a sworn statement by Orologio's president that the company applied for co-op funding outside the context of the Partner Plan (despite purportedly believing—based on Swatch's representations—that such funding was available *only* via the Partner Plan), *id.* at 502, and, of course, Swatch itself disputes that it ever made such representations, *see id.* at 572-73, 619, 807. Thus, at the very least, the record presents a material question of fact as to whether Orologio was, in fact, misled by Swatch as to the availability of co-op funds outside the context of the Partner Plan, thus depriving Orologio of the "notice" of the promotional benefits required under § 2(d), (e).

---

[8] For its part, Swatch rebuts this characterization of the co-op funding program, stating that "Omega's Co-op Commitment program was independent of the Partner Plan, meaning that if dealers did not achieve Partner Plan program credit because the dealer failed to meet sales goals (such as Orologio), they still had the opportunity to obtain [Swatch] co-op assistance . . . ." Appellee's Br. 54.

Second, there is evidence in the record that Swatch's decisions as to granting or denying a co-op fund application, as well as how much funding to give, were made on an ad hoc, case-by-case basis without any objective standards. *Id.* at 619, 729, 808; *see also* 16 C.F.R. § 240.9. These alleged facts pose the second § 2(d), (e) question: whether Swatch offered co-op funds based on objective, "proportionally equal" criteria.[9]

The District Court further erred in concluding that because Orologio did not affirmatively request tagged ads that it could not make out an RPA claim. *See* App. 19. Rendering a promotional benefit "available" requires affirmatively putting retailers on notice of its availability, not merely passively entertaining requests initiated by the retailers themselves. 16 C.F.R. § 240.10(b) ("The seller has an obligation *to take steps* reasonably designed to provide notice to competing customers of the availability of promotional services and allowances." (emphasis added)); *accord Alterman Foods, Inc. v. F.T.C.*, 497 F.2d 993, 1001 (5th Cir. 1974) ("[A] supplier must not merely be willing, if asked, to make an equivalent deal with other customers, but must take affirmative action to inform them of the availability of the promotion programs."); *Vanity Fair Paper Mills, Inc. v. F.T.C.*, 311 F.2d 480, 484-85 (2d Cir. 1962). Moreover, the District Court's determination that "there is no evidence that Orologio was unaware that it could make a tagging request," App. 19, ignores the fact that, once it is shown that some retailers receive a promotional benefit that others do not, "the burden of proving the availability of

---

[9] There is also evidence in the sealed appendix that at least tees up a genuine question as to whether retailers *not* participating in the Partner Plan obtained co-op funds (despite Orologio's contention that such funds were only supposed to be available to plan participants). *See id.* at 2794.

similar [benefits] to [the retailer's] competitors" is on Swatch—not Orologio. *See*

*Alterman Foods*, 497 F.2d at 1001. Thus, the District Court cannot base summary

judgment on its conclusion that Orologio failed to seek tagging itself.

For the same reason, the burden is on Swatch to demonstrate that, despite

awarding slotting fees to a single retailer in New York City and Las Vegas, it made the

availability of slotting fees plain to its authorized dealers. The District Court's rejection

of the slotting fees claim was thus premature. *See* App. 20. Moreover, the District

Court's reliance on *El Aguila Food Products, Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612

(S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005), to find in Swatch's favor on

the slotting fees claim was misplaced given (1) its unsupported assertion that slotting fees

"are generally not considered valuable" and (2) the fact that "Swatch did not consider

Orologio's positioning of Omega as conveying value" being insufficient to justify not

alerting Orologio of the availability of slotting fees more generally (even if it would not

end up *receiving* such fees after some objective review). *See* App. 20.

For the foregoing reasons, we will reverse the District Court's order granting

summary judgment to Swatch on Orologio's claims under § 2(d), (e) of the RPA and

remand for further proceedings.[10]

### C. Motion to Strike and for Sanctions due to Spoliation

We review the District Court's denial of Orologio's motion to strike Swatch's

Answer and issue sanctions based on alleged spoliation of evidence for abuse of

---

[10] Because we perceive disputed questions of material fact, we will not accept
Orologio's invitation to grant its partial motion for summary judgment on its RPA claims.

discretion, *Bull*, 665 F.3d at 73; *Meditz*, 658 F.3d at 367 n.1; *Complaint of Consolidation Coal Co.*, 123 F.3d at 131, meaning we will only reverse if the District Court's decision was based "on an erroneous view of the law or on a clearly erroneous assessment of the evidence," *Adams v. Ford Motor Co.*, 653 F.3d 299, 304 (3d Cir. 2011) (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 538 (3d Cir. 2007)).

Here, the relevant motion was based on alleged spoliation of evidence by Swatch concerning the destruction of tapes that contained tagged television commercials provided to certain Omega retailers. Spoliation of evidence requires "bad faith," not mere negligence, *Bull*, 665 F.3d at 79 (requiring bad faith for spoliation and subsequent sanctions), and in denying Orologio's motion, the District Court relied in part on its finding "that Orologio has failed to show bad faith on Swatch's part," App. 11 n.5. Orologio insists there are no facts in the record to support the District Court's denial, and points us instead to a magistrate judge's stated belief that there was a prima facie case of spoliation here. But even in expressing her concern over the destruction of the tapes in the midst of litigation, the magistrate judge indicated she discerned no allegation by Orologio of a nefarious plot to destroy evidence. The District Court found that, *inter alia*, Orologio "failed to show bad faith on Swatch's part." App. 11 n.5. We conclude that the specific email exchanges in the record that reference destruction of the tapes amply support the District Court's determination that neither Omega's brand manager nor the employee who initiated destruction of the tapes acted in bad faith. The District Court therefore did not make a "clearly erroneous assessment of the evidence" related to the

20

motivations behind the destruction of the tapes and did not abuse its discretion in denying Orologio's motion based on the lack of a showing of bad faith on the part of Swatch.[11]

## IV.   Conclusion

For the foregoing reasons, we will affirm the District Court's entry of summary judgment against Orologio's FPA claim and its denial of Orologio's motion to strike and for sanctions, but we will reverse the District Court's entry of summary judgment against Orologio's RPA claims.  Rather than address Orologio's motion for partial summary judgment on its RPA claims, we will remand to the District Court for proceedings consistent with this opinion.

---

[11] Because bad faith is a requirement for spoliation of evidence, and we find no abuse of discretion on that point, we need not address the District Court's additional reasoning for denying the motion, such as the alleged availability of other avenues to obtain information about the content of the tapes or Orologio's failure to show that Swatch attempted to obstruct Orologio.  *See* App. 11 n.5.